**UNITED PARCEL SERVICE,**
Petitioner/Cross–
Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–
Petitioner.**

Nos. 93–6354, 93–6461.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 15, 1994.

Decided Dec. 9, 1994.

Charles Hampton White (argued and briefed), Cornelius & Collins, Nashville, TN, for petitioner.

Jayme L. Sophir (argued and briefed), N.L.R.B., Office of the General Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Paul J. Spielberg (briefed), N.L.R.B., Appellate Court Branch, Washington, DC, for respondent.

Before: KENNEDY, CONTIE, and SUHRHEINRICH, Circuit Judges.

CONTIE, Circuit Judge.

United Parcel Service ("UPS") seeks review and the National Labor Relations Board ("Board") seeks enforcement of the Board's Decision and Order finding that UPS violated the National Labor Relations Act ("Act") by issuing a warning notice to a UPS driver who refused to remove a union insignia lapel pin from his uniform. We grant UPS' petition for review, deny the Board's cross-application for enforcement, and reverse the Board's Decision and Order.

## I.

Petitioner UPS transports and delivers small packages worldwide. Approximately 1000 employees work at its operating center (or "hub") in Memphis, Tennessee. Though many of these UPS employees are not required to wear uniforms (because they do not meet the public), UPS employs approximately 130 "feeder" (tractor-trailer) drivers and 170 "package car" (delivery truck) drivers at its Memphis hub. UPS requires its feeder and package car drivers to wear brown uni-

forms supplied by UPS to present "a neat, business-like appearance" to the public.[1] Petitioner's Brief at 5.

UPS maintains and enforces uniform and personal appearance standards which provide (in relevant part):

> Our guidelines were developed to ensure that the appearance of all UPS people who meet the public while on the job reflect qualities that are part of our high standards of service and professionalism.
>
> . . . .
>
> The complete uniform is to be worn while on duty.... Only designated uniform items approved by UPS are acceptable.

UPS' Uniform and Personal Appearance Guidelines.

The August 1, 1990 through July 31, 1993 collective bargaining agreement between UPS and the International Brotherhood of Teamsters ("Union") provides (in relevant part):

> The Employer agrees that if any employee is required to wear any kind of uniform as a condition of his/her continued employment, such uniform, except shirts, shall be furnished and maintained by the Employer free of charge.
>
> . . . .
>
> The Employer has the right to establish and maintain reasonable standards concerning personal grooming and appearance and the wearing of uniforms and accessories.

National Master United Parcel Service Agreement at 110.

In June 1991, Mike Brewer, a UPS feeder driver and chief job steward at the Memphis hub, attended the Union's convention in Orlando, Florida. While there, Brewer purchased 50 lapel pins[2] that he later distributed to feeder drivers who, in his opinion, were loyal Union members that had supported his attendance at the convention.

---

1. Most feeder drivers drive tractor-trailers between UPS facilities. At truck stops, feeder drivers encounter other truck drivers, waiters and waitresses, restaurant patrons, and other motorists. Some of the feeder drivers based in Memphis also perform central pick-up unit services that require daily interaction with UPS custom-

ers. Accordingly, UPS and the Union agree that the feeder and package car drivers are in contact with the public.

2. The dime-sized pins display the Union's logo and an abbreviation of the Union's name.

Shortly thereafter, Brewer learned that Art Shumway, a UPS feeder manager, had instructed two feeder drivers (Barry McDonald and Carl Johnson) to remove the lapel pins from their shirt collars because they were not authorized uniform accessories. Gary Adkins, UPS' feeder division manager in Memphis, subsequently posted the following notice:

*To All Feeder Drivers:*

I've inquired about the I.B.T. that some of the drivers have been wearing.

*You cannot* wear these pins according to Article 4 of the contract. Job stewards, or designated alternates, shall be allowed to wear an identifying stewards' badge, provided by the Union, at all times while on the Employer's premises.

At the present time only the stewards' badge may be worn on the uniform while on duty on UPS premises.

*So please do not wear these pins.*

Thank you for your help.

Joint Appendix at 151 (emphasis in original). Brewer continued to wear the pin in defiance of the notice.

On July 15, 1991, Adkins warned Brewer that disciplinary action would be taken if the feeder drivers continued to wear the lapel pins. On July 17, 1991, Adkins issued Brewer a written warning, pursuant to Article 49 ("Discharge or Suspension") of the collective bargaining agreement, for violating UPS' uniform standards.

Though Brewer did not file a grievance challenging the disciplinary notice, the Union filed unfair labor practice charges against UPS. The Board's general counsel subsequently issued a complaint. Following a hearing, the administrative law judge ("ALJ") recommended that the complaint be dismissed:

It should first be noted that Respondent and Union have had a long and apparently amicable collective-bargaining relationship. Moreover, Respondent has a strict dress code for the package and feeder drivers, which is sanctioned by the contract and which is consistently enforced in a non-discriminatory manner. Furthermore, Respondent permits job stewards to wear steward's pins when on Respondent's property.

With this as background, the undisputed evidence indicates that Brewer wanted employees to [wear the pins] for his own personal reasons, *i.e.,* as a token of appreciation for supporting his attendance at the IBT convention. A reading of the contract, in conjunction with the personal appearance guidelines, and in consideration of the fact that both applied to package drivers as well as feeder drivers who wear identical uniforms, makes the separation of the two categories of drivers impossible. Therefore, a finding of a violation would, in effect, grant permission to all uniform drivers to wear unauthorized union insignia.

What this comes down to is balancing the hardship to employees prohibited from wearing the IBT pin against the hardship to the Respondent if it is allowed. Under the circumstances of this case, I can find no particular hardship to the few employees if they are prohibited from wearing a pin which was distributed to employees for personal reasons, having very little to do with union support or mutual aid and protection. On the other hand, finding a violation would not only interfere with the contract rights of the parties but also jeopardize Respondent's dress code, which has been a cornerstone of its business of long standing duration.

[B]ecause finding a violation would not effectuate the purposes and policies of the Act, I recommend dismissing these allegations.

ALJ's December 7, 1992 Decision at 4–5.

The Board, however, reversed the ALJ and concluded that UPS had violated the Act by issuing the disciplinary notice to Brewer:

In determining whether an employer, in furtherance of its public image business objective, may lawfully prohibit uniformed employees who have contact with the public from wearing union insignia, the Board considers the appearance and message of the insignia to determine whether it reasonably may be deemed to interfere with the employer's desired public image . . . .

We fully appreciate the Respondent's history of presenting to the general public its image of a neatly uniformed driver and acknowledge that this image is an important business objective of the Respondent. Contrary to the judge, however, we cannot find that the pin at issue in this case may reasonably be deemed to interfere with the Respondent's objective. The pin is small, neat, inconspicuous, and free of any provocative message or language. In these circumstances, we cannot find that the pin when worn by the Respondent's uniformed drivers interferes in any meaningful way with their desired image as neatly attired. We accordingly conclude that the Respondent has not demonstrated special circumstances sufficient to justify its prohibition of the unobtrusive union lapel pin. Customer exposure to union insignia, standing alone, is not a special circumstance which permits an employer to prohibit display of such insignia by employees.

Our conclusion is buttressed by the Respondent's discriminatory conduct respecting the wearing of pins. As the judge found, the Respondent has authorized its Memphis facility drivers while in contact with the public to wear safe driving pins, United Way pins, 1–million mile Mack truck pins, and pins in support of Operation Desert Storm. Indeed, the Respondent itself issued some of those pins, at least two of which have no apparent relation to the Respondent's business. All of these pins are at least equal or greater in size than the lapel pin at issue in this case. The Respondent has thus discriminatorily enforced its personal appearance guidelines by forbidding the union pin while permitting, and even issuing to its drivers, a variety of pins containing other messages.

We accordingly find that the Respondent violated Section 8(a)(1) of the Act by ordering Brewer to remove a pin displaying union insignia, by issuing to Brewer on July 11 a written memorandum prohibiting him from wearing union insignia pins on his uniform, and by issuing to Brewer on July 17, 1991, a disciplinary warning for wearing the union insignia pin.

Board's September 30, 1993 Decision and Order at 2–3 (citations and footnotes omitted).

UPS petitioned this court to review and set aside the Board's Decision and Order. The Board, in turn, filed a cross-application to enforce its Decision and Order.

## II.

### Standard of Review

The Board's findings of fact must be upheld if supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). "The Board's application of the law to particular facts is also reviewed under the substantial evidence standard." *East Tennessee Baptist Hosp. v. NLRB,* 6 F.3d 1139, 1143 (6th Cir.1993). Though the Board's reasonable inferences "may not be displaced on review even though the reviewing court might have reached a different conclusion had it considered the matter *de novo,*" *id.* (citations omitted), reviewing courts must set aside Board decisions which rest on erroneous legal foundations. *Id.* Moreover, where "there is disagreement between the Board and its ALJ, the substantial nature of the evidence supporting the Board's findings is further called into question, and the reviewing court must examine the record with greater care." *NLRB v. Homemaker Shops, Inc.,* 724 F.2d 535, 545 (6th Cir.1984) (citation omitted). "This is so even when the Board does not disagree with the ALJ's factual findings, as such, but draws different inferences from those facts." *Id.* (citation omitted).

### The Balancing of Rights

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7 of the Act]." Among those rights are "the right to self-organization [and the right] to form, join, or assist labor organizations[.]" 29 U.S.C. § 157. "The test for determining whether an employer has violated section 8(a)(1) is whether the employer's

conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *NLRB v. Okun Bros. Shoe Store, Inc.,* 825 F.2d 102, 105 (6th Cir.1987) (citation omitted), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988). "In making this determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact upon the employees." *Id.* (citations omitted).

UPS claims that:

The interests of UPS in creating and maintaining a public image of neatness of its uniform personnel and equipment, which come into contact with the public, override any conflicting rights that a few feeder drivers in Memphis, Tennessee have under Section 7 of the Act.

. . . .

UPS' standards are explicit and are designed to achieve the same public image as its clean, daily washed package cars and feeders which travel the highways of America every day, delivering packages from around the world. The uniform standards are clear and unambiguous. There is no evidence of any deviation by UPS management in enforcing the uniform standards, especially the provisions regarding uniform items which must be approved by UPS in order to be acceptable. Furthermore, there is no evidence of any effort by UPS to restrict, or in any way circumscribe the union activities of its employees under either Section 7 of the Act or under the collective bargaining agreement insofar as uniforms are concerned. Brewer's testimony confirms that his distribution and wearing of the pins was an entirely personal matter. . . .

Petitioner's Brief at 13–14.

The Board, in response, maintains that its findings are supported by substantial evidence:

The right of employees to wear such insignia is clear. The Company's assertion of "special circumstances" is based on its unsupported assessment that no pin, no matter how unobtrusive, can be consistent with a favorable corporate "image." [T]he Company has offered no evidence that any of its customers reacted negatively to the pins, nor has it offered any other evidence to validate its avowed concern that the pins would have an adverse effect on its public image. In the absence of such evidence, common sense suggests that the Union's discrete, inconspicuous pin would not compromise the Company's effort to present a "neat, clean" uniformed driver to the public. Indeed, in permitting—if not requiring—its employees to wear pins that are similar in size and character to the Union's pin, the Company has itself acknowledged that this is the case.

Respondent's Brief at 16 (citations and footnote omitted).

In *Burger King Corp. v. NLRB,* 725 F.2d 1053 (6th Cir.1984), this court held that the restaurant's ban on the wearing of union buttons by employees who had contact with the public was not an unfair labor practice because: the restaurant chain was attempting to project a clean, professional image to the public; the restaurant consistently enforced its policy against wearing unauthorized buttons in a nondiscriminatory manner; the chain derived much of its recognition from its public image; and, the policy was not created in response to union activities. Specifically, this court held:

As to the labor union button worn by Griggs, the employee who had contact with the public, we find that all of the Burger King food-handling employees are provided with identical uniforms which they are required to wear on the job in a neat and well-pressed condition. The policy includes a published regulation that "only company approved name tags, buttons and alterations in uniforms are allowed. . . ."

Here Burger King has attempted to project a clean, professional image to the public. It has consistently enforced its policy against wearing unauthorized buttons in a nondiscriminatory manner. It is a national fast food chain deriving much of its recognition from its uniform public image. It is not asserted that this policy had its inception because of labor unions or union activities. There are special circumstances which justify this prohibition. The NLRB order regarding union buttons will not be

enforced insofar as it applies to employees who have contact with the public. *We think the rule in this circuit should be that where an employer enforces a policy that its employees may only wear authorized uniforms in a consistent and nondiscriminatory fashion and where those employees have contact with the public, a "special circumstance" exists as a matter of law which justifies the banning of union buttons.*

*Id.* at 1055 (citations omitted) (emphasis added).

 The parties do not dispute UPS' right under the collective bargaining agreement to promulgate and enforce appearance standards. Because the uncontroverted evidence reveals that UPS' uniformed personnel have substantial contact with the public, the only issue left for determination is whether UPS discriminatorily enforced its appearance standards by prohibiting the feeder drivers from wearing the union lapel pins distributed by Brewer. The ALJ resolved this issue in favor of UPS. The Board reversed.

The evidence reveals that UPS maintained a consistent effort to project to the public an image of cleanliness, uniformity and efficiency. In fact, there is no evidence that UPS condoned or permitted any uniform accessories, pins or other insignia that it did not issue, sanction or authorize. Though the Board cites UPS' issuance of "Desert Storm" pins, safe driving pins, United Way pins, and Mack Truck pins as indicative of UPS' discriminatory enforcement of its uniform policy, the collective bargaining agreement between UPS and the Union contains no limitations or restrictions on UPS' right to promulgate appearance and uniform standards.

Accordingly, we grant UPS' petition for review, deny the Board's cross-application for enforcement, and reverse the Board's Decision and Order.