*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0307p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MEIJER, INC.,

     *Petitioner/Cross-Respondent,*

  *v.*

NATIONAL LABOR RELATIONS BOARD,

     *Respondent/Cross-Petitioner.*

Nos. 05-1951/2025

On Petition for Review and Cross-Application
for Enforcement of a Decision of
the National Labor Relations Board.
No. 9-CA-40631.

Argued: June 2, 2006

Decided and Filed: August 21, 2006

Before: BOGGS, Chief Judge; and KEITH and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Cynthia W. Warren, MEIJER, INCORPORATED, LEGAL DEPARTMENT, Grand Rapids, Michigan, for Petitioner. Philip Hostak, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent. **ON BRIEF:** Cynthia W. Warren, Jeffrey Scott Rueble, MEIJER, INCORPORATED, LEGAL DEPARTMENT, Grand Rapids, Michigan, for Petitioner. Philip Hostak, Aileen A. Armstrong, Howard E. Perlstein, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent.

---

## OPINION

---

  BOGGS, Chief Judge. Meijer, Inc. petitions for review of an order by the National Labor Relations Board (NLRB or the Board) that it cease and desist from enforcing its policies against union solicitation by employees, found by the Board to constitute unfair labor practices. The Board petitions for enforcement of the order. We grant in part Meijer's petition for review and reverse a portion of the Board's opinion. We also grant in part the Board's cross-application for enforcement and affirm its final order, vacating only that portion of the order that sanctions Meijer for punishing

an employee for conducting union solicitation when it had no knowledge of the protected nature of the conduct.

# I

Meijer operates "hypermarkets." Each of their single stores includes a supermarket, a general merchandise store, a pharmacy, and a restaurant, open twenty-four hours a day, seven days a week. In 2003, Robert Caldwell was a warehouse clerk for Meijer at its Tipp City, Ohio location. That facility includes a hypermarket in addition to warehouses supporting Meijer's other locations. It has several parking areas, one near the retail center (the retail lot), primarily for customers and retail employees, and another, gated, lot for employees of the non-retail distribution center (the distribution lot). The retail lot occupies about ten acres and has approximately 1000 parking spaces. Clerks from the retail operation collect shopping carts from the retail lot, do some landscaping work, and shovel snow in limited areas. Occasionally, outside vendors or organizations, such as NASCAR or Coca-Cola, use the retail lot for promotional events. Meijer also uses some of the retail lot to sell seasonal or bulky products like lawnmowers and above-ground pools.

Caldwell drove a "standup reach fork" in the general merchandise warehouse. Workers at the facility, as a condition of employment, are members of the United Food and Commercial Workers Local 1099 (the Union). Caldwell was unsatisfied with his union representation[1] and endeavored to replace the current union with a new one, an organization he called "Real Union." To promote this effort, Caldwell talked to his coworkers and distributed literature urging that they join.

On October 17, 2003, Caldwell finished his shift early and parked in the distribution lot in time for a shift change. As employees of the warehouses arrived and departed, Caldwell distributed membership cards for Real Union. This activity was interrupted when Chris Cullen, a Union steward in the warehouse, became agitated with Caldwell, complaining loudly and with vulgarity that the employees were already represented by a labor union. Cullen told Caldwell to leave because he "didn't belong there." When he would not, Cullen said, "I'll take care of this," and placed a call to Jack Evans of Meijer security on his mobile phone. Cullen told Evans that someone was bothering people in the distribution lot. By the time Evans arrived, Caldwell had started to leave, stopping only to distribute a Real Union card to employee Lisa Patton on his way out. This last stop was impromptu, and therefore Caldwell's truck was not parked in a marked space.

When Evans arrived he did not see any disturbance. However, he noticed Caldwell's truck, recognized Caldwell, and approached him. Evans asked whether he was on the clock and what he was doing. Caldwell testified that he told Evans that he was soliciting for Real Union, but the Administrative Law Judge (ALJ) credited Evans's conflicting testimony that Caldwell never answered his question concerning "what he was doing." Evans told Caldwell to leave the parking lot. Caldwell said "We'll see about that," and left. It was only after Caldwell had left that Evans asked Patton to see the literature she had received from Caldwell and learned that he had been soliciting for Real Union.

On October 20, Evans reported the incident to Matthew Jamrog, a Meijer executive with labor relations responsibility. As a result of that conversation, Evans distributed a memo to the security staff informing them that union solicitation was allowed during nonworktime in nonwork areas. This definition included Caldwell's activity in the distribution lot. Jamrog also sent a letter that day to Caldwell informing him that, according to published company policy, the retail lot was

---

[1]Caldwell's website states: "Bottom line is they still get our dues every paycheck whether our contract sucks or not. And with the seventy-five dollar initiation fees, they actually get more when Meijer has a higher turnover rate! Talk about an incentive for lazy self-centered union hall bosses to keep doing nothing!"

considered to be a working area, where he could not solicit for Real Union. According to Jamrog: "The company considers our store parking lots to be a 'work area' since we have team members that work in this outside area of the store." *Meijer, Inc.*, Nos. 9-CA-40631; 9-CA-40778, 2005 WL 1551221, 344 NLRB No. 115, slip op. at 5 (June 29, 2005) [hereinafter *Meijer*]. Soon after receiving the October 20 letter, Caldwell asked Evans to clarify the company's policy. He was referred to Mike Sullivan, Meijer's building manager. Sullivan explained to Caldwell that he could distribute literature in the distribution lot during nonworktime to nonworking employees, but that he could not do the same in the retail lot.

Meijer's company policy on solicitation is included in a "team member handbook," a publication distributed to all employees. It states that no solicitation is allowed on worktime and that no solicitation is allowed in any work area. In contravention to this policy, and pursuant to its collective bargaining agreement with the Union, Meijer *does* allow solicitation on worktime to raise money for the Union's political fund—the Active Ballot Club.

On October 21, 2003, and again on January 5, 2004, Caldwell filed charges against Meijer with the NLRB. Caldwell alleged that Meijer had prevented him from distributing union literature and that it maintained a rule prohibiting distribution in its retail lot. This interference, alleged Caldwell, violated his rights under the National Labor Relations Act. 29 U.S.C. §§ 151–169 [hereinafter the Act]. The case was tried before the ALJ on May 24, 2004. The court heard testimony from Caldwell, Evans, Patton, Sullivan, Jamrog, and a Meijer building manager, Ken Barclay. A three-hour videotape of activity in the retail lot was also submitted.

In an August 31, 2004, opinion, the ALJ held that Meijer had not violated the Act when it stopped Caldwell from soliciting in the distribution lot because the NLRB's General Counsel had "failed to meet his burden of proving that Evans *knew* Caldwell was engaged in concerted protected activity when he asked him to leave the parking lot on October 17." *Meijer*, at 8 (emphasis added). Alternately, the ALJ held that even if Evans's conduct had violated the Act, Jamrog's letter of October 20 repudiated that illegal conduct because it "assured Caldwell that, in the future, he would be permitted to distribute literature in the distribution facility parking lot." *Ibid.*

After viewing a videotape that depicted two and one-half hours of activity in the retail lot, the ALJ found that work in the retail lot was "periodic" or "sporadic," and that the functions performed in the retail lot were "incidental" to Meijer's core business, "selling merchandise inside its stores." *Id.* at 6. Accordingly, the ALJ held that Meijer's policy of prohibiting union solicitation in its retail lot was an unfair labor practice. Additionally, the ALJ held that Meijer had engaged in an unfair labor practice by allowing fundraising on working time for the Union's Active Ballot Club, "prohibiting employees from soliciting during working time, while simultaneously permitting employees to engage in a specific type of solicitation on behalf of the Union during working time." *Id.* at 9. The ALJ ordered that Meijer cease and desist from prohibiting union activity by off-duty employees in its retail lot and promulgating an inconsistent rule of solicitation as evidenced by the Active Ballot Club. *Id.* at 9–10.

The Board's General Counsel and Meijer both filed exceptions to the decision of the ALJ and the case was considered by a panel of three Board members who issued their decision and order on June 29, 2005. *Id.* at 1. The Board reversed two of the ALJ's holdings. First, it found that the ALJ "erred in imposing a burden upon the General Counsel to show that Evans had knowledge of Caldwell's protected activity when he directed Caldwell to leave." *Id.* at 2. The Board held that the correct test was an objective one: "whether the Respondent's conduct would reasonably tend to interfere with, threaten, or coerce employees in the exercise of their [] rights." *Ibid.* Second, the Board held that Jamrog's October 20 letter to Caldwell did not repudiate any illegal conduct because it "contained an unlawful prohibition on solicitation and distribution" in the retail lot. *Ibid.* The Board held that, since there was insufficient evidence that the retail lot was a work area, the

prohibition contained in the letter constituted independent unlawful conduct and could not serve as a repudiation.  *Ibid.*  The Board upheld the other portions of the ALJ's decision and issued an order consistent with its findings.  *Id.* at 3.

## II

The Board has jurisdiction "to prevent any person from engaging in any unfair labor practice."  29 U.S.C. § 160(a).  "This court has jurisdiction over petitions to review or enforce orders issued by the NLRB."  *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 752 (6th Cir. 2003) (citing 29 U.S.C. § 160(e)).  There is no statutory time limit for the filing of a petition for review of a final order of the NLRB.  29 U.S.C. § 160(e), (f).

The legal conclusions of the Board are entitled to deference.  We "recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life."  *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236 (1963).  *See also NLRB v. Aquatech, Inc.*, 926 F.2d 538, 548 (6th Cir. 1991).  The Board's construction of the Act is permissible where it does not "exceed the reach" of the Act and "the Board has adequately explicated the basis of its interpretation."  *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266–67 (1975).  *See also United Parcel Serv., Inc. v. NLRB*, 228 F.3d 772, 774–75 (6th Cir. 2000).  "The judicial role is narrow:  The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced."  *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978).  *See also Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842–43 (1984) (agencies and reviewing courts must give effect to the unambiguously expressed intent of Congress).

The Board's findings of fact are conclusive if supported by substantial evidence on the record as a whole.  29 U.S.C. § 160(e).  Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  *See also TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002).  The Board's application of the law to the facts is also reviewed under the substantial evidence standard.  *NLRB v. Talsol Corp.*, 155 F.3d 785, 793 (6th Cir. 1998).  A court should "intervene only in what ought to be the rare instance when the standard appears to have been misapprehended or grossly misapplied."  *Universal Camera*, 340 U.S. at 491.

## III

Section seven of the Act grants employees the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  It is unlawful, under § 8 of the Act, and an unfair labor practice, "to interfere with, restrain, or coerce employees" in their exercise of these rights.  29 U.S.C. § 158(a)(1).  "The Board is empowered," through its orders, "to prevent any person from engaging in any unfair labor practice."  29 U.S.C. § 160(a).

### A

Recent NLRB case law holds that "evidence of employer knowledge is not a necessary element of a [§] 8(a)(1) violation. . . [T]he test is whether the [employer's] conduct would reasonably tend to interfere with, threaten, or coerce employees in the exercise of their Section 7 rights."  *Alliance Steel Prods., Inc.*, 340 NLRB 495, 495 (2003).  The Board, in the case at bar, relied on *Alliance Steel Products* and its interpretation of the Act when it held that Meijer's interference with Caldwell's Real Union solicitation on October 17, 2003, was an unfair labor practice.  *Meijer*, at 2.  Meijer objects to the Board's construction of the Act.  It contends that

knowledge of the protected nature of the conduct is an essential and requisite element of a § 8(a)(1) violation. We agree.

Contrary to the position of the Board, the test must have a subjective element in these cases since "[t]he only restriction that [the] Act places upon an employer's right to discharge employees, is that it not be *because of* union activity or affiliation," *NLRB v. Challenge-Cook Bros. of Ohio, Inc.*, 374 F.2d 147, 151 (6th Cir. 1967) (emphasis added). This proposition has been firmly established since the Supreme Court's seminal interpretation of the Act appeared in *NLRB v. Jones & Laughlin Steel Corp.*

> The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion.

301 U.S. 1, 45–46 (1937).

Similarly, the Supreme Court's decision in *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964), supports our holding that a violation of § 8(a)(1) requires knowledge on the part of an employer. In *Burnup & Sims*, two employees were dismissed while soliciting for their union because a third employee informed management that the union organizers were prepared to "use dynamite to get in" if the union drive failed. *Ibid.* The charges turned out to be unfounded, but the employer dismissed the employees "because of the alleged statements." *Id.* at 21. The employer defended itself from the employee's unfair labor practices charge by claiming a good-faith belief in the veracity of the accusations threatening violence. The Supreme Court held that the Act was violated "whatever the employer's motive" and that "honest belief in the truth of the statement was not a defense" *Id.* at 22. The Court strongly defended the rights of the employees to participate in protected activities, no matter what their employer believed to be their motive for it.

> Otherwise the protected activity would lose some of its immunity, since the example of employees who are discharged on false charges would or might have a deterrent effect on other employees. Union activity often engenders strong emotions and gives rise to active rumors. A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith.

*Id.* at 23. Important to our analysis today, the Court concluded that, so long as an employer knows an employee is engaged in protected activity, the reasons given after the fact are no defense to an unfair labor practices charge:

> In sum, § 8(a)(1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, *that the employer knew it was such*, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct.

*Ibid.* (emphasis added).

Our precedents also establish that a § 8(a)(1) violation contains a knowledge requirement. In *Air Surrey Corp. v. NLRB*, 601 F.2d 256, 257 (6th Cir. 1979) (per curiam), an employer's paychecks had recently been returned for insufficient funds. A group of concerned employees then visited the employer's bank to determine if their paychecks would be honored. *Ibid.* One of the employees entered the bank to inquire, while the others stayed in the car. *Ibid.* He was informed

that, no, there were not enough funds to cover the entire payroll. *Ibid.* A company official later learned of the bank visit and confronted the employee group. *Ibid.* Only one admitted to the allegation and he was fired. In vacating the decision of the Board finding a violation, we held that an employer must be aware that employees participate in "concerted activity" under the Act:

> It has long been the law in our circuit that an employer cannot be held in violation of § 8(a)(1) of the Act when it discharges an employee for activity which may in fact be protected under the Act but the employer lacks knowledge of its protected character. It is the employer's knowledge of an employee's protected activity and his subsequent discharge of the employee for engaging in such activity which violates the Act.

*Ibid.* (citation omitted). *See also Jim Causley Pontiac, Div. of Jim Causley, Inc. v. NLRB*, 620 F.2d 122, 125 (6th Cir. 1980) (relying on *Air Surrey*, *supra*).

In *NLRB v. Westinghouse Electric Corp.*, 179 F.2d 507 (6th Cir. 1949) (per curiam), we considered another case of concerted activity. There, one Fouty, an employee engaged in war production, became concerned that the wage at his plant, where most of the workers were women, was lower than the wage at a similar plant staffed by men. *Id.* at 508. Fouty was dismissed for "agitation." *Ibid.* Although there was evidence that Fouty had engaged in concerted activity on the wage issue, there was no evidence that Westinghouse knew of it. On this evidence, the Board found that Westinghouse "'either knew or should have known' of Fouty's connection with the organizational activities," and held that his discharge was an unfair labor practice. *Ibid.* We denied enforcement of the Board's order:

> The inescapable effect of [using an objective test] is to place upon the employer the duty of ascertaining the existence of union activity and the participation of specific employees in it. . . . We think no such duty rested upon the employer or its supervisory employees. We think the record fully discloses that Fouty was not discharged for union activities . . . . The Board also found that Fouty's discharge violated [the Act] because it interfered with the employees' concerted activity without reference to union activity. The evidence does not disclose any knowledge on the part of the employer or its supervisors of any concerted activity or of Fouty's participation in such activity.

*Id.* at 508–09 (formatting altered).

The Board attempts to distinguish *Air Surrey* and *Westinghouse* from the facts at bar by noting that the employees in both those cases were discharged for their actions, whereas Caldwell was only reprimanded. *See* Br. of Resp't at 25. This argument does not explain why the difference between discharge and discipline should alter any rule. We agree with Meijer that it would be an absurd result for us to determine that Caldwell may be discharged but not reprimanded where his employer lacks knowledge that his activity was union-related. Rep. Br. of Pet'r at 4 n.3.

The Board next argues that the correct interpretation of the Act is to be found in *United Parcel Service v. NLRB*, 41 F.3d 1068, 1071–72 (6th Cir. 1994). It argues from that case that "'[t]he test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights.'" *Ibid.* Out of context, this statement appears to support the Board's position. However, as applied to the case at bar, it is obiter dictum.

In *United Parcel*, the test quoted by the Board was utilized to balance the respective rights of the employer and its union employees. UPS *knew* its actions, banning the display of certain union insignia on its uniforms, affected union members' rights under the Act to some extent—it became

the role of the court to balance the parties' opposing interests and determine if UPS's actions amounted to a violation of the Act. Had UPS banned pins *in general*, not knowing that they might contain union content or that their display was concerted activity, and had the ALJ and the Board credited this position, only then would its facts be analogous and its holding applicable here.

The employer's motivation was simply not an issue in *United Parcel*. Where motivation is an issue, our cases hold that "[t]he Board's General Counsel [has] the burden of proving that the discharge was impelled by a discriminatory or anti-union motive." *Propak Corp. v. NLRB*, 578 F.2d 169, 170 (6th Cir. 1978). *See also NLRB v. Howell Automatic Mach. Co.*, 454 F.2d 1077, 1080 (6th Cir. 1972) ("The question as to the Company's motivation in firing is a factual one to be determined primarily by the Trial Examiner and the Board"); *NLRB v. Murray-Ohio Mfg. Co.*, 358 F.2d 948, 950 (6th Cir. 1966) ("The motivation was a question of fact to be determined by the Board from consideration of all the evidence"). This determination is necessary if we are to comply with *Jones & Laughlin's* command that:

> The act does not interfere with the normal exercise of the right of the employer . . . to discharge [its employees]. . . the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than [violations of the Act.]

301 U.S. at 45–46.

Since the Act does not interfere with an employer's rights to discipline its employees, the Board's interpretation is inconsistent with the Act and in error. If the test were "whether the Respondent's conduct would reasonably tend to interfere with, threaten, or coerce employees in the exercise of their [] rights," an employer's recognized rights would be infringed. For example, if Caldwell had been loitering in the retail lot while off-duty, Evans would clearly have had the authority to ask him to leave, or to discharge him. We hold that where an activity can be either conduct protected by the Act or conduct that may be prohibited by an employer, depending upon its relation to concerted or union activity, an employer's knowledge is an element of a § 8(a)(1) violation. In situations identical to the one at bar, Caldwell must tell Evans that he is distributing union literature and his statements to this effect must be credited at trial.

For these reasons, we deny the Board's request to enforce and vacate that portion of the order relating to Caldwell's ejection from the distribution lot on October 17.

B

The Supreme Court has held that the Board, "in light of its experience," may fashion general rules for application to generic labor disputes. *Beth Israel Hosp.*, 437 U.S. at 493. "[A]bsent special circumstances," certain employer restrictions are presumptive violations of employee rights and unfair labor practices under § 8(a)(1). *Ibid.* Thus, regarding distribution of union literature by employees: "[R]estrictions on employee solicitation during nonworking time, and on distribution during nonworking time in nonworking areas, are violative of § 8(a)(1) unless the employer justifies them by a showing of special circumstances which make the rule necessary to maintain production or discipline." *Id.* at 492–93 (footnote omitted). In *United Parcel*, we summarized these rules.

> If an area is a work area, [the employer] may prohibit the distribution of union literature. If it is a non-work area and the union literature is dispersed during non-working time, [the employer] may not stop the distribution. If the area is a mixed area, meaning that, while some people may use the area for work, most of the employees use it for non-work purposes-such as a lunch area or a break area—[the employer] still may not prohibit the distribution of union literature.

228 F.3d at 776.

Union access to parking lots has previously been evaluated in this circuit in *NLRB v. Ohio Masonic Home* where we adopted language used by the Board in *Tri-County Medical Center, Inc.*, 222 N.L.R.B. 1089 (1976).

> In *Tri-County*, the medical center promulgated a rule prohibiting off-duty employees from distributing union literature in the employees' parking lot. In holding the no-access rule invalid, the NLRB concluded:
>> such a rule is valid only if it (1) limits access solely with respect to the interior of the plant and other working areas; (2) is clearly disseminated to all employees; and (3) applies to off-duty employees seeking access to the plant for any purpose and not just to those employees engaging in union activity.

*NLRB v. Ohio Masonic Home*, 892 F.2d 449, 452–53 (6th Cir. 1989). *See also NLRB v. S. Md. Hosp. Ctr.*, 916 F.2d 932, 935 (4th Cir. 1990) (noting a lack of evidence that union solicitation at front entrance impacted patient care); *NLRB v. Pizza Crust Co. of Pa., Inc.*, 862 F.2d 49, 53 (3d Cir. 1988) ("except where justified by business reasons, a rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid"); *NLRB v. Clark Manor Nursing Home Corp.*, 671 F.2d 657, 660 (1st Cir. 1982) (no business reasons justify the exclusion of solicitation in nursing home parking lot). Therefore, if the retail lot is a working area and if Meijer cannot identify any special circumstances, its ban on union solicitation is an unfair labor practice.

The ALJ and both parties agree with the rule stated in *Santa Fe Hotel, Inc.*, 331 NLRB 723, 730 (2000), that "'[s]ome work tasks . . . are performed at some time in almost every area of every company,'" so "[i]n order to constitute a work area, an area must be integral not merely incidental, to the employer's main function." *Meijer*, at 8.

The ALJ held, and the Board affirmed, that Meijer's retail lot was not a working area:

> The primary purpose of the Respondent's retail store parking lots is to provide customer and employee parking. They are also places where employees perform a variety of periodic or sporadic work activities. Utility clerks periodically retrieve shopping carts and, as necessary, assist customers load purchases. Sporadically, the Respondent's employees display merchandise or conduct sidewalk sales and other promotional events. Unlike the stores, there are no employees permanently stationed in the parking lots, there are no cash registers and no constant customer-employee interaction. There are also occasions when other companies are permitted to hold promotional events, like NASCAR racing, United Way fundraisers, and Coca Cola-sponsored children's activities. However, these functions are merely incidental to the Respondent's primary function—the business of selling merchandise inside its stores. Indeed, the Respondent treats its parking lots as an incidental function by permitting its employees to flout the directive to park on the outer portions, thereby preventing customers from parking closer to the store.
> As depicted in videotape of store 102's parking lot, there is a continuous, albeit dispersed, flow of pedestrian and vehicular activity throughout the parking lot on a typical day. However, the activity shown failed to reveal the performance of a significant amount of work in the parking lot, which was half full. Utility clerks collected and pushed shopping carts on several occasions, but none are seen assisting customers. There was no evidence of a sidewalk sale or any type of promotion.

*Meijer*, at 8–9. Substantial evidence clearly supports this factual finding. We can reasonably accept as adequate the evidence relied upon by the ALJ to support the Board's conclusion that Meijer's retail lot is a nonwork area.

Our decision in *United Parcel* supports this holding. There we held that a driver check-in area where employees were "free to talk, read newspapers and magazines, or stand around until their assigned driving time" was a mixed-use area where the employer could not prohibit union solicitation and distribution. 228 F.3d at 775–76. Meijer's retail lot is similar to the check-in area in *United Parcel* in that it is a natural gathering place for employees as they arrive for work and depart for home. *See also Beth Israel Hosp.*, 437 U.S. at 490 (noting "there are relatively few places where employees can congregate or meet on hospital grounds or in the nearby vicinity for the purpose of discussing nonwork related matters").

Relying on the seminal case, Meijer argues that the retail parking lot, in light of its sidewalk sales and occasional special events, is an extension of its retail sales floor. *See Marshall Field & Co. v. NLRB*, 200 F.2d 375 (7th Cir. 1953). It is undisputed that union solicitation may be prohibited on a retail sales floor where it "may unduly interrupt or disturb the customer-salesperson relationship with a detrimental effect upon the employer's business." *Id.* at 380. Meijer insists that "the company uses its parking lots as an extension of its interior sales floor." Br. of Pet'r at 31. However, this statement is insufficient to overcome the evidence presented at the May 24 hearing. No evidence of a sidewalk sale or other event was shown to the ALJ. There were no salespeople observed on the videotape in over two hours of elapsed time. Had Caldwell actually disrupted sales activity in the retail lot, *Marshall Field* would certainly figure into the analysis, but, on this record, the Board's factual finding that the retail lot is a nonworking area should not be disturbed.

Meijer next argues that special circumstances brought about by motor vehicle safety concerns in the retail lot allow it to ban union solicitation. We reject this argument because Meijer offers absolutely no evidence to support this generic safety concern. Meijer describes nothing about activity in the retail lot that can be categorized as special. If accepted, the "contention that all its property is a work area is a contention that can be asserted by every company, thus effectively destroying the right of employees to distribute literature." *U.S. Steel Corp.*, 223 NLRB 1246, 1248 (1976). "These 'special circumstances' are typically offered by employers, and they are just as typically rejected by the Board." *Ibid.* (citations omitted). Meijer cannot rebut the presumptive invalidity of its ban on solicitation without some specific evidence of unusual circumstances in its retail lots. *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803–04 (1945) (finding an absence of special circumstances where employer failed to introduce evidence of "unusual circumstances involving their plants.").

Lastly, Meijer argues that permitting solicitation in the retail lot risks embroiling customers in union organizational activities and that the company "should be entitled to shield its retail customers from this kind of activity." Br. of Pet'r at 35. We need not consider this claim because Meijer forfeited it when it failed to raise it before the Board. *See Allied Mech. Servs., Inc. v. NLRB*, 113 F.3d 623, 627 (6th Cir. 1997) (citing *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982)).

Even absent forfeiture, this argument lacks merit. Meijer relies on *Virginia Electric & Power Co. v. NLRB*, 703 F.2d 79, 82 (4th Cir. 1983), where a divided panel of the Fourth Circuit held that an employer's directive to employees that they refrain from wearing certain union insignia on lapel buttons was not an unfair labor practice. However, the decision in *Virginia Electric* was quite narrow, limited to "large, brightly colored, and potentially provocative" buttons. *Ibid.* To the contrary, Meijer's policy is not so subtle. It bans all union solicitation, rather than attempting to control annoying or harassing union activity. Where the role of the Board is to provide "an adjustment between the undisputed right of self-organization assured to employees under the

Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments," *Republic Aviation Corp.*, 324 U.S. at 797–98, the Board was reasonable in rejecting Meijer's suggestion to curtail entirely Caldwell's right to solicit for his Real Union in the retail lot.

We therefore grant the Board's request to enforce and affirm those portions of the order prohibiting Meijer from banning union solicitation in its parking lots or promulgating or publishing any similar policy.

C

Meijer argues that it repudiated any violation of the Act in its October 20 letter to Caldwell by informing him that he could solicit for Real Union in the distribution lot. Br. of Pet'r at 22. Although we agree with Meijer that the Act was not violated when Caldwell was asked to leave the distribution lot on October 17, it is not the case that its ongoing violation of the Act through its published solicitation policy was cured through Jamrog's October 20 letter. We agree with the Board that repudiation of an action violating the Act must be unambiguous. Accordingly, Jamrog's letter was ineffective because it reiterated the company's illegal policy of banning solicitation in the retail lot. Br. of Resp't at 27–28.

In *Sam's Club v. NLRB*, 141 F.3d 653 (6th Cir. 1998), we approved the Board's test for determining when an employer's repudiation of illegal conduct serves to forestall a charge of unfair labor practices under the Act.

> To be effective . . . repudiation must be "timely," "unambiguous," "specific in nature to the coercive conduct," and "free from other proscribed illegal conduct." Furthermore, there must be adequate publication of the repudiation to the employees involved and there must be no proscribed conduct on the employer's part after the publication. And, finally, the Board has pointed out that such repudiation or disavowal of coercive conduct should give assurances to employees that in the future their employer will not interfere with the exercise of their . . . rights.

*Id.* at 661 (quoting *Passavant Mem'l Area Hosp.*, 237 NLRB 138, 138–39 (1978)). *See also Autozone, Inc. v. NLRB*, Nos. 94-6280; 94-6408, 1996 WL 200291 (6th Cir. April 24, 1996) (unpublished); *Red Arrow Freight Lines, Inc.*, 289 NLRB 227, 229 (1988).

Meijer argues that we should instead apply the rule articulated in *Atlantic Forest Products*, 282 NLRB 855 (1987). There, the Board upheld an employer's repudiation of a solicitation restriction that was far more limited in scope than the violation we currently have before us. *Id.* at 872. In *Atlantic Forest*, only three employees were involved in the violation. *Ibid.* We previously considered and rejected Meijer's argument in *Autozone, supra*. In *Autozone*, we distinguished *Atlantic Forest* in the same way that applies here. Unlike the employer in *Atlantic Forest*, Meijer's policies affect an unknown number of employees because the policy is published in its employee handbook. Therefore, without altering that publication, Meijer could not convey to its employees that it recognized that its policy of banning solicitation in the retail lot was improper. *Autozone*, 1996 WL 200291, at *6. For the same reasons found in *Autozone*, Meijer's argument that its letter can serve as a repudiation fails.

Finally, contrary to Meijer's assertions, *see* Br. of Pet'r at 25, this case is unlike *Tri-County Medical Center*, 222 NLRB 1089, 1093 (1976). In *Tri-County*, a hospital employee was disciplined for distributing union literature on the rear loading dock of a hospital. *Ibid.* However, the employer's action was repudiated less than three hours later. *Ibid.* This case can be distinguished because in *Tri-County* "the situation was almost immediately rectified, no disciplinary action was taken and [the employee] was expressly informed that she was free to engage in handing out

literature on nonworking time." *Ibid.* Caldwell was unaware of his rights for several days following the incident and, when finally informed of them, he was told that solicitation in the retail lot was not allowed. The repudiations in the two cases are therefore clearly dissimilar.

### D

The Active Ballot Club provision of the Union's collective bargaining agreement allows Union representatives to solicit contributions during worktime. Meijer's statements show that Caldwell was not afforded similar access. Simply put, this policy constitutes a clear violation of the law in this circuit.

An employer may legitimately exclude union organizers from its property, even while allowing solicitation from other groups, for example, charities. "To discriminate in the enforcement of a no-solicitation policy cannot mean that an employer commits an unfair labor practice if it allows the Girl Scouts to sell cookies, but is shielded from the effect of the Act if it prohibits them from doing so." *Sandusky Mall Co. v. NLRB*, 242 F.3d 682, 686 (6th Cir. 2001). Rather, unlawful discrimination in allowing solicitation is established only when the employer "'favor[s] one union over another.'" *Albertson's Inc. v. NLRB*, 301 F.3d 441, 451 (6th Cir. 2002) (quoting *Cleveland Real Estate Partners v. NLRB*, 95 F.3d 457 (6th Cir.1996), *overruled on other grounds*, *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115 (6th Cir.1997)). Allowing solicitation for the Active Ballot Club during worktime while excluding all other union solicitation does just that—it favors the Union over all others, including Caldwell's Real Union.

Accordingly, we grant the Board's request to enforce and affirm that portion of the order requiring Meijer to promulgate a non-discriminatory union solicitation policy.

### IV

For the reasons stated above, we **GRANT** in part Meijer's petition and the Board's cross-petition and **VACATE** only that portion of the Board's decision and order regarding Caldwell's activity on October 17, 2003.