RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DELMAS CONLEY, doing business as Conley
Trucking,
                        *Petitioner/Cross-Respondent,*

                v.                                          Nos. 07-1399/1529

NATIONAL LABOR RELATIONS BOARD,
                        *Respondent/Cross-Petitioner.*

---

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
Nos. 9-CA-42562; 9-CA-42437.

Argued: January 31, 2008

Decided and Filed: March 31, 2008

Before: DAUGHTREY and McKEAGUE, Circuit Judges; GWIN, District Judge.[*]

---

**COUNSEL**

**ARGUED:** R. Alan Lemons, MILLER, SEARL & FITCH, Portsmouth, Ohio, for Petitioner.
Jeffrey Horowitz, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.
**ON BRIEF:** R. Alan Lemons, MILLER, SEARL & FITCH, Portsmouth, Ohio, for Petitioner.
Jeffrey Horowitz, Linda Dreeben, Meredith L. Jason, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Respondent.

---

**OPINION**

---

        PER CURIAM. Delmas Conley, doing business as Conley Trucking, petitions for review
of a decision of the National Labor Relations Board (NLRB) that affirmed an administrative law
judge's ruling that the petitioner had engaged in various unfair labor practices. The Board has also
filed an application with the court seeking enforcement of that decision.

        In an opinion that was adopted in all substantive respects by the NLRB, the administrative
law judge concluded that Conley Trucking violated provisions of the National Labor Relations Act,

---

        [*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by
designation.

29 U.S.C. §§ 151 - 169. Specifically, the administrative law judge determined that the company violated the Act by discharging an employee who supported unionization, by creating the impression that employees' union activities were being monitored, and by threatening various adverse consequences if unionization of the company were to occur. Before this court, Conley Trucking asserts that two of the five unfair labor practices found by the Board cannot be sustained because the administrative law judge improperly relied upon hearsay evidence in reaching those conclusions and that, without consideration of the hearsay, substantial evidence does not exist in the record to support the Board's decision. For the reasons discussed below, however, we conclude that there is substantial evidence to support the Board's decision and, therefore, grant the request for enforcement of its administrative order against Conley Trucking and deny the company's petition for review.

### FACTUAL AND PROCEDURAL BACKGROUND

This appellate proceeding has its genesis in an unsuccessful effort by the General Truck Drivers and Helpers Union Local # 92, International Brotherhood of Teamsters, to organize drivers at Conley Trucking, a sole proprietorship in Portsmouth, Ohio, owned by Delmas Conley and run primarily by Conley's sons, R.J. and Rodney. Conley Trucking does not dispute that its drivers "haul and deliver gravel, sand, salt, and stone in dump trucks for customers" and that the company is subject to the requirements of the National Labor Relations Act.

Some time during the summer months of 2005, R.J. Conley observed union pamphlets in the company parking lot and informed his father of that fact. Additionally, R.J. "heard employees talking about a Union around the workplace" and "probably" disclosed that information to his father as well. Nevertheless, no overt efforts at unionization of the Conley Trucking drivers occurred until October 2005, when Teamsters organizer Rick Kepler met at an area restaurant with drivers Jeremy Thompson, Ata Thunderdance, Roger Rosenogle, and Dan Gulliver. A second meeting organized by Kepler convened at a Lucasville fast-food establishment on Sunday, October 23, 2005, and was attended by Thompson, Thunderdance, Rosenogle, Gulliver, Tim Gilbert, and Steve Delabar. At that second meeting, each of the Conley Trucking employees present signed a union card indicating a desire to be represented by the Teamsters in workplace negotiations.

Jeremy Thompson subsequently signed two different affidavits that were prepared by an NLRB agent. In a November 16, 2005, affidavit, Thompson claimed:

> The following Wednesday [after the October 23 meeting with Kepler] I was at the office at Conley. There were 3 or 4 other drivers standing around that I don't normally talk to. I don't know their names. It was about 4:30 or 5:00 p.m. R.J. Conley came over. We talked about everyday business. Conley then said[,] "I heard something today." I said[,] "What's that?" He said[,] "I heard you, Tim Gilbert, and Steve Del[a]bar were trying to get a union in here." I said Del[a]bar and Gilbert had nothing to do with it. That was the end of the conversation.

The day after Thompson's exchange with R.J. Conley, Tim Gilbert was informed that his wife had suffered a possible stroke and had been transported to the emergency room, although she was subsequently discharged after refusing recommended procedures. Consequently, Gilbert informed Rodney Holden, a dispatcher and scheduler for Conley Trucking, that he would not be able to work the following day because of the need to take his wife to the family doctor for a follow-up visit. On that Friday, October 28, 2005, Gilbert drove his wife to her physician, who, after examining test results, commented that Gilbert's wife should be taken immediately to the emergency room for a spinal tap and additional care that could not be provided in an office setting. Once Gilbert's wife was readmitted to the hospital, Gilbert and his daughter drove to Conley Trucking so that Gilbert could receive his weekly paycheck. Gilbert was handed an envelope by Holden, an

envelope that Gilbert discovered contained not only his paycheck but also a notice that he had been terminated from his employment due to his "Absenteeism/Tardiness."

According to one of the affidavits provided by Thompson, anti-union comments continued to be made by Conley Trucking management officials after Gilbert's termination. For example, Thompson stated in one affidavit:

> About 1 week to 1.5 weeks after Gilbert was fired I was at the shop. About 4 or 5 other drivers were there. Roger Rosenogle was there. Dave Jordan, a mechanic was there. The others I am not sure of. It was after work at 5 or 5:30 p.m. R.J. Conley told us he couldn't talk about it but he can legally say that he can sell his trucks if he so chooses. He said he can't afford to pay the big wage that the Union was promising us. He said his company didn't generate that kind of money. He said if they could get a union in there and it would benefit the guys they would gladly do it, but they couldn't afford it. I think R.J. started talking after one of the employees asked him about it. He said if we wanted a union, it would be our choice and we could vote on it and he didn't have any say in it. We didn't reply to this. I recall that R.J. said we would make $7-8 per hour if the union came in because they went in the hole last year with fuel costs being high.

Furthermore, Thompson later claimed in another affidavit:

> About late October or early November 2005, I was loading my work truck at the dock when Delmas Conley approached me. It was about 8:30 or 9:00 a.m. No one else was present, but Dan Conley was getting loaded in the general area. Conley told me that he wanted to have an "off the record" conversation about the Union. I told him that it would be off the record. Delmas asked me if I had a tape recorder on me and I opened my coat to show him that I did not. Delmas said that he would fight the Union and would shut the company down. He said that if we stopped right now, no one would lose their jobs, but if it didn't stop right now, we would all lose our jobs. Delmas said that he would shut the company down if we unionized. He said he would use scab labor. . . . Delmas said that the Union was good years ago, but was not worth a fuck now. Delmas said that he would fire anyone he wanted and that he owned the company and could do anything he wanted anytime and that no one short of the President of the United States could tell him otherwise. Delmas said that if the Union won, he would bargain us down to minimum wage and lock us out and use scab labor. Delmas said that the Union had hurt Conley and had set him back 10 years.

Other testimony damaging to Conley Trucking came from R.J. Conley, who admitted to numerous other comments made by him or by his father in the weeks after the news of potential unionization of the company's drivers came to light. For example, R.J. testified that he remembered telling Ata Thunderdance and other drivers "that if a Union comes in, 'we start from zero and have to bargain everything.'" He further admitted that, at a December 23, 2005, meeting, Delmas Conley expressed his desire that the company stay non-union, "that he would not like outside people telling him how to run his business," "that if employees want to work for a Union trucking company . . . they [could] go somewhere else rather than Unionize his facility," "that if employees wanted more control over the business that they could buy and drive their own trucks rather than Unionize," and that he would sell them a truck, or even the entire business, rather than have them vote for union representation.

Having been informed of these comments and events, the Board's general counsel filed charges, and eventually a complaint, against Conley Trucking, alleging the unlawful termination of

Tim Gilbert in retaliation for his union activity, the unlawful creation of an impression of surveillance of employees' union activities, and improper efforts to coerce the workers not to vote for the union. Although Conley Trucking officials admitted to making many of the statements that the general counsel alleged were in violation of the Act, they countered the allegation of retaliatory termination of Gilbert with testimony indicating that Gilbert was far from a model employee and that he was fired, not for union activities, but for numerous transgressions of workplace rules, for excessive absenteeism, and for substandard work performance.

In particular, R.J. Conley testified that Gilbert had shown up for work on March 9, 2005, too intoxicated to drive after being found asleep in his own car in the company parking lot with a beer can between his legs. Even so, on that occasion, Gilbert was not suspended by his employers and received only a written warning. Additionally, the company asserted that Gilbert was the only driver who had been involved in multiple accidents during the relevant time period, jackknifing a company truck on July 11, 2005, causing approximately $1000 in damage, backing his truck into the truck of Steve Delabar in September 2005, causing another $1,200 - $1,300 in damage, and backing his truck into another truck driven by Charlie Floyd. Also, R.J. Conley testified that Gilbert was once seen parked in a rest area for an extended period of time with other Conley Trucking drivers, rather than returning with an additional load prior to quitting work for the day. Conley Trucking management also alleged before the administrative law judge that Gilbert had more missed loads than any other driver for the period between November 1, 2004, and December 31, 2005, and that Gilbert was chronically late for work and missed more days of work than the number to which he was entitled. Finally, the company contends that Gilbert failed to show up for work on Saturday, October 15, 2005, a designated mandatory workday, instead opting to remain home to cut firewood for the winter.

In response to the company's arguments that Gilbert was terminated solely for his substandard work record, the Board's general counsel adduced testimony that the company failed to discipline Gilbert for any of the alleged workplace infractions at the time they were committed, other than the one occasion on which he reported for work while intoxicated. Furthermore, testimony established that even though many other drivers had less-than-stellar attendance records, that even though other drivers also missed an inordinate number of work loads, and that even though other drivers were involved in accidents resulting in greater vehicle repair costs to the company, no other driver had been terminated by the management of the company before Gilbert's dismissal.

The general counsel also attempted to introduce testimony from Jeremy Thompson to substantiate that the Conleys were aware of Gilbert's pro-union activities shortly before the termination decision was made. In contravention of the information Thompson had previously provided in affidavits, however, once he was sworn at the administrative hearing, he denied that anybody from Conley management ever said anything to him about the union. When confronted with his prior affidavit clearly stating that R.J. Conley had indeed mentioned that he knew that "[Thompson,] Tim Gilbert and Steve Delabar were trying to bring a Union into his workplace," Thompson acknowledged the inconsistency but explained that when offering information for the affidavit, he "was upset, . . . under the influence also and . . . was angry, so [he] may have exaggerated the points a little bit."

At the close of the hearing, the administrative law judge recognized that the Thompson affidavits offered by the Board's general counsel constituted hearsay to the extent that the information contained in those affidavits was offered to prove the truth of the matters asserted and not merely to impeach the credibility of the witness's testimony. Nevertheless, because "hearsay evidence is admissible [at Board proceedings] if 'rationally probative in force and if corroborated by something more than the slightest amount of other evidence,'" the administrative law judge determined that the affidavits should be admitted as substantive evidence to be evaluated and weighed in the same manner as other non-hearsay testimony. *Delmas Conley d/b/a Conley*

*Trucking*, 349 NLRB No. 30, 2007 WL 324557, at \*5 (Jan. 31, 2007) (quoting *Dauman Pallet, Inc.*, 314 NLRB 185, 186 (1994)).  In so ruling, the administrative law judge explained the rationale for his decision as follows:

> [W]hile mindful that Board proceedings are to follow the F[ederal] R[ules of] E[vidence] "so far as practical," in my view federal labor policy concerns would render decidedly impractical adherence to an evidentiary rule that precluded the administrative law judge from having discretion to substantively consider these pretrial affidavits.
>
> One of the chief concerns that motivated the modern trend to allow the substantive use of some prior witness statements, as reflected in FRE 801(d), was concern about witness intimidation – i.e., witnesses who could be intimidated or were otherwise vulnerable to pressure with the result that their prior statements were a more reliable guide to the fact finder than their testimony in the courtroom.  According to the Congressional subcommittee considering enactment of the rules of evidence proposed by the Supreme Court, support for the Supreme Court's proposal to permit an even broader substantive use of prior inconsistent statements than Congress ultimately adopted in the FRE was "based largely on the need to counteract the effect of witness intimidation."  The Notes of the Advisory Committee reviewing the rules of evidence proposed by the Supreme Court opined that the Court's proposed Rule 801(d)(1)(A) "provides a party with desirable protection against the 'turncoat' witness who changes his story on the stand and deprives the party calling him of evidence essential to his case."
>
> \* \* \* \* \*
>
> [T]he concern with witness intimidation that prompted the modern movement toward permitting the substantive use of some prior inconsistent statements in federal court is even more acute in the arena of Board litigation.  It is precisely because of the "peculiar character of labor litigation" with its reliance on witnesses "especially likely to be inhibited by fear" that, as a matter of effectuating federal labor policy, administrative law judges should have the discretion to consider sworn pretrial affidavits as substantive evidence.  For when a witness testifies in marked contradiction to his pretrial statement, and particularly where in the opinion of the administrative law judge that testimony reeks of untruthfulness, and further, where, as here, the employer has met with and discussed the contents of the employee's pretrial statements with the employee, the ability of the judge to consider substantively the witnesses pretrial statements becomes an important tool in the search for truth and an antidote to the threat to Board enforcement proceedings posed by witness intimidation.

*Id.* at \*\*6-8 (some citations, some internal quotation marks, and footnotes omitted).

Even though the administrative law judge ultimately accepted Thompson's affidavits as substantive evidence, he also made clear that such admission "is not tantamount to crediting the claims in the affidavits over all other evidence. Rather, . . . the assertions in the affidavits must be considered with and against the record evidence as a whole, including, . . . the denial of the allegations by witnesses aligned with Conley Trucking." *Id.* at \*9.  In doing so, the administrative law judge concluded that "Thompson's testimony at the hearing was thoroughly untruthful." *Id.* at \*4.  Nevertheless, he refused to view all contrary evidence as necessarily credible and worthy of belief; instead, the administrative law judge required corroboration of the allegations made in

Thompson's affidavits before  allowing those statements to serve as substantive evidence made against Conley Trucking.

As a result, the administrative law judge recommended dismissal of some charges brought against the trucking company and found violations of the Act in other circumstances.  On one hand, the administrative law judge concluded that Conley Trucking violated the Act in the following instances:

> 1) by creating the impression that the company was conducting surveillance of the employees' union activity;
>
> 2) by threatening the employees on or about November 3, 2005, that any bargaining with the union would "start from zero";
>
> 3) by encouraging union supporters on December 23, 2005, to leave their employment with Conley Trucking;
>
> 4) by threatening on December 23, 2005, to sell the company's trucks, and even the company itself, if the employees voted for the union; and
>
> 5) by discharging Tim Gilbert in retaliation for his support of the union.

On the other hand, however, the administrative law judge dismissed charges against Conley Trucking that:

> 1) R.J. Conley stated *in early November 2005* that the company could sell its trucks if the workers unionized;
>
> 2) R.J. Conley told the employees that he would change their method of pay should they vote for a union;
>
> 3) Delmas Conley threatened *on October 25, 2005*, that he would sell his trucks and/or his business in case of a pro-union vote; and
>
> 4) Delmas Conley stated *in late October or early November 2005* that he would close his business before allowing unionization, that employees would lose their jobs unless they ceased unionization efforts, and that unionization would result in a pay decrease.

A three-member panel of the Board adopted the administrative law judge's recommended order with only two minor, non-substantive modifications.  Conley Trucking then petitioned this court for review of that administrative decision and the NLRB  filed a cross-application for enforcement of the Board's order.

### DISCUSSION

Pursuant to the express language of section 7 of the National Labor Relations Act, 29 U.S.C. § 157, employees are guaranteed the right to organize and to bargain collectively for their mutual aid or protection.  Moreover, section 8 of the Act makes it an unfair labor practice for an employer to interfere with those rights or to discourage membership in any labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C. §§ 158(a)(1) and (3).  *See also Opportunity Homes, Inc. v. NLRB*, 101 F.3d 1515, 1518 (6th Cir. 1996), *overruled on other grounds as recognized in NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115 (6th Cir. 1997).

The threshold test for determining whether an employment decision constitutes an unfair labor practice is whether the decision at issue was motivated by anti-union animus. *See NLRB v. Cook Family Foods, Ltd.*, 47 F.3d 809, 816 (6th Cir. 1995). The Board bears the initial burden of showing, by a preponderance of the evidence, that the employer's decision was motivated by the employee's exercise of rights protected by the Act. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983), *overruled on other grounds*, *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994); *Cook Family Foods, Ltd.*, 47 F.3d at 816. If such a showing is made, the burden of persuasion "shifts to the employer to demonstrate by a preponderance of the evidence that it would have made the same decision regardless of the fact that the employees engaged in protected activity." *Ishikawa Gasket Am., Inc. v. NLRB*, 354 F.3d 534, 537 (6th Cir. 2004) (citing *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir. 2000)).

This court then reviews *de novo* any legal conclusions made by the Board. *See 3750 Orange Place Ltd. P'ship v. NLRB*, 333 F.3d 646, 654 (6th Cir. 2003). We will uphold the Board's findings of fact, however, if supported by substantial evidence on the record. *See* 29 U.S.C. §§ 160(e) and (f). "Substantial evidence" has been defined as such evidence as is "adequate, in a reasonable mind, to uphold the [Board's] decision." *Gen. Fabrications Corp.*, 222 F.3d at 225. "Deference to the Board's factual findings is particularly appropriate where the 'record is fraught with conflicting testimony and essential credibility determinations have been made.'" *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987) (quoting *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 965 (4th Cir. 1985)).

In its request for relief, Conley Trucking asks "that the Board's decision be vacated in its entirety and the complaint of the General Counsel be dismissed." As noted by the Board and by general counsel, however, Conley Trucking failed to present proper objections before the Board to some of the administrative law judge's conclusions and recommendations. Indeed, the company's exceptions to the administrative law judge's finding "that [it] violated Sec. 8(a)(1) of the Act by threatening employees that bargaining with the Union would start from zero" fail "to allege with any degree of particularity . . . the error it contends the judge committed, or on what grounds it believes the judge's decision as to this violation should be overturned." *Delmas Conley d/b/a Conley Trucking*, 2007 WL 324557, at *1 n. 2. Consequently, absent "extraordinary circumstances," which are not present in this matter, such an objection that is not properly "urged before the Board, its member, agent, or agency, shall [not] be considered by the court." 29 U.S.C. § 160(e).[1]

Furthermore, Conley Trucking does not argue in its appellate brief against the validity of the Board's rulings regarding two other findings by the administrative law judge that were affirmed by the Board. Any challenges to those rulings have thus been waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") Moreover, Conley Trucking, through its agents, conceded at the administrative hearing that those offending, anti-union comments had indeed been made.

Specifically, R.J. Conley admitted during his hearing testimony that his father "invited union supporters to leave their employment with Conley Trucking" by stating "that if employees want to work for a Union trucking company that he preferred that they go work somewhere else rather than Unionize his facility." As noted by the administrative law judge:

---

[1] The Board's general counsel also filed "no exceptions to the judge's dismissal of allegations that the Respondent violated Sec. 8(a)(1) by threatening to sell its trucks and to reduce its employees' pay, and by threatening job loss and plant closure in late October and early November 2005." *Delmas Conley d/b/a Conley Trucking*, 2007 WL 324557, at *1 n.2.

It is well settled that an employer's invitation to an employee to quit in response to their exercise of protected concerted activity is coercive, because it conveys to employees that support for their union or engaging in other concerted activities and their continued employment are not compatible, and implicitly threaten discharge of the employees involved.

*Delmas Conley d/b/a Conley Trucking*, 2007 WL 324557, at *18 (quoting *McDaniel Ford, Inc.*, 322 NLRB 956, 956 n.1, 962 (1997)).

R.J. Conley also confirmed during his testimony that his father told company employees that if they "wanted more control over the business . . . they could buy and drive their own trucks instead of Unionize," and "added that he would sell them a truck and would, in fact, sell them his entire business." In addition, Delmas Conley himself admitted at the administrative hearing that he made comments to the employees about "outsiders running [the] company" and that he would sell his trucks and his business to the workers if they desired. As the administrative law judge and Board concluded, "This was not a business offer. Conley was telling employees that in retaliation for their desire to unionize he was willing to radically alter the employer-employee relationship. . . . The threat of reprisal for union activity in the comment is manifest and violative of Section 8(a)(1) [of the Act]."

As a result of admissions by Conley Trucking of various anti-union comments, the failure of the company to argue in its brief that certain conclusions made by the administrative law judge were erroneous, and the decisions of Conley Trucking and the Board's general counsel not to file proper exceptions to other determinations made by the administrative law judge, only two rulings by the Board remain for our review. Both of those holdings – that Conley Trucking improperly created the impression of surveillance of employees' union activity and that Conley Trucking improperly discharged Timothy Gilbert for engaging in activities in support of union representation – rely upon information contained in affidavits executed by Jeremy Thompson, affidavits that Thompson later repudiated in large part during his hearing testimony. Thus, the administrative law judge's and Board's resolution of those questions may be upheld only if we determine that the admission of the recanted affidavits as substantive evidence was indeed proper.

Before this court, both parties apparently concede that the information contained in Thompson's two affidavits, if offered to prove the truth of the matters asserted therein, constituted hearsay evidence. Conley Trucking and the Board's general counsel disagree, however, over whether such hearsay should be admissible as substantive evidence to be evaluated by the administrative law judge and the Board itself.

Pursuant to the Federal Rules of Evidence, "hearsay," defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), is not generally admissible in federal courts. *See* Fed. R. Evid. 802. Nevertheless, administrative hearings, like the proceeding before the administrative law judge in this labor dispute, are not necessarily bound by the same evidentiary strictures as are federal district courts. Indeed, the express language of 29 U.S.C. § 160(b) provides that such agency proceedings shall, *only* "*so far as practicable*, be conducted in accordance with the rules of evidence applicable in the district courts of the United States . . . ." (Emphasis added.)

In this case, the only direct evidence of Conley Trucking's knowledge of Timothy Gilbert's association with the union organizing effort came from Jeremy Thompson's affidavits discussing Thompson's conversations with R.J. Conley only days after a union organizing meeting and only shortly before Conley terminated Gilbert's employment with the company. Because admission of those affidavits as substantive evidence, especially in the face of Thompson's later disavowal of statements made within the affidavits, would give the impression that the company was tracking its

employees' union activities and that the company fired Gilbert because of his perceived leadership role in the organizing effort, Conley Trucking now urges us to hold that strict adherence to federal evidentiary rules is required in all but the most limited circumstances.

The decision of the administrative law judge, however, relied upon numerous federal court decisions and prior Board rulings that, in turn, cited other decisions that have permitted admission of hearsay as substantive evidence of violations of federal labor laws. In doing so, the administrative law judge emphasized that Congress's insertion of the language "so far as practicable" into the National Labor Relations Act demonstrated that some deviation from the Federal Rules of Evidence was envisioned and was deemed necessary by the legislative drafters in order to effectuate federal labor policy. In its appellate brief, however, Conley Trucking argues that the precedents upon which the administrative law judge relied are extremely limited in their application. Consequently, argues Conley Trucking, hearsay has been admitted as substantive evidence of labor law violations only in instances involving: (1) application of state evidentiary rules rather than the Federal Rules of Evidence, *see, e.g.*, *Starlite Mfg. Co.*, 172 NLRB 68 (1968); (2) stipulations by the parties that the hearsay evidence is admissible, *see, e.g.*, *In re El Mirador*, 340 NLRB 715 (2003); (3) a failure by a party to object to the admissibility of the evidence, *see, e.g.*, *Alvin J. Bart and Co.*, 236 NLRB 242 (1978), *enforcement denied*, *NLRB v. Alvin J. Bart and Co.*, 598 F.2d 1267 (2d Cir. 1979); *Bay Refrigeration Corp.*, 322 NLRB 1045 (1997); (4) affidavits prepared by agents of the subject companies such that the evidence is considered an admission of the party pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence, *see, e.g.*, *Alvin J. Bart and Co.*; *Bay Refrigeration Corp.*; or (5) testimony that was subject to cross-examination in a prior trial or that was sworn to before a grand jury, *see, e.g.*, *DeSisto v. United States*, 329 F.2d 929 (2d Cir. 1964).

Conley Trucking's argument in this regard is, however, unpersuasive. The fact that prior decisions allowing hearsay testimony as substantive evidence have, to-date, fallen into neat pigeonholes does not mean that other scenarios are not possible or legally supportable. This court, for instance, has stated broadly that administrative law judges are "not obliged to strictly adhere to the Federal Rules of Evidence." *3750 Orange Place Ltd. P'ship*, 333 F.3d at 666. Similarly, the Seventh Circuit, discussing the relevant provision of 29 U.S.C. § 160(b), recognized that "[t]he Board is not bound absolutely to apply the Federal Rules of Evidence under this provision, and it may, where appropriate, fashion its own particular rule of evidence – for example, where a rule will facilitate the bargaining process." *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1479 (7th Cir. 1992).

Whether the scenario presented in this appeal tracks exactly the factual and legal patterns of prior cases in which the admission of hearsay evidence has been allowed is thus of little import. Instead, the more germane inquiry is whether the relaxation of the Federal Rules of Evidence by the administrative law judge was reasonable under the circumstances and limited in its application to the practicalities of this situation. Here, the administrative law judge's first-hand observations of Jeremy Thompson's demeanor raised a concern that the company, wielding superior economic power, had intimidated Thompson at a time when, as an employee, he was still dependent upon the company for his livelihood. The judge clearly found that, without adoption of a relaxed evidentiary rule to permit a more complete picture of the situation faced by Conley Trucking's workers, there was a distinct possibility that company officials would succeed in suppressing evidence otherwise available for consideration in determining whether an unfair labor practice had occurred.

To counteract that undesirable possibility, the administrative law judge fashioned a workable rule permitted by the governing statutes that met the challenge presented to him. He noted that Thompson, at the time he gave the statements contained in his affidavits, was given the opportunity to review those comments for accuracy and was asked to vouch for their truthfulness. Nevertheless, even though the statements were given by Thompson in relaxed, non-coercive atmospheres, the

administrative law judge refused to accept uncritically every statement made in the affidavits. To the contrary, the fact-finder scoured the administrative record for testimony that supported and contradicted the affiant's assertions and required some corroboration, however slight, for the out-of-court statements before crediting their substance.

We conclude that the compromise reached by the administrative law judge represents an exemplary application of – and respect for – the federal rules of evidence "so far as practicable." The administrative law judge's evidentiary ruling in this matter clearly does not signal a rejection of traditional evidentiary guidelines and an era of *carte blanche* admission of heretofore inadmissible testimony. Rather, in line with the principles espoused in section 160(b) of title 29 of the United States Code, the decision recognizes the need to examine the unique circumstances of each dispute before the administrative body to determine whether some flexibility in the standards governing admissibility of evidence would enhance or upset the delicate balance to be struck between furtherance of general guiding principles and maintenance of recognizable, applicable rules.

Section 160(b) vests within the Board the authority to deviate from the Federal Rules of Evidence when the agency believes it is not practicable both to adhere to such rules and to protect workers' rights. Thus, even without citation to another court ruling or administrative decision whose factual scenario approximates that found in this proceeding, the administrative law judge's concern for protection of witnesses from employer intimidation justified the admission as substantive evidence of those portions of Thompson's affidavits for which some additional corroboration could be found in the administrative record. The administrative law judge summarized it best in explaining:

> Where an allegation in the complaint is supported *solely* by a statement in Thompson's affidavit, and the record is devoid of *any* corroboration that supports the likelihood of the truth of the statement, then I have determined that allegation fails due to a lack of sufficient evidence, without regard to credibility resolutions. Where there is some form of corroboration then I will consider whether to credit or discredit the various competing testimony as is the traditional practice. Although the extra "burden" this places on the General Counsel may not be warranted in every case where pretrial statements are considered substantively, in this case I believe that it provides an important brake on the use of Thompson's pretrial statements as a sole source of support for a finding of a violation of the Act by [Conley Trucking].

*Delmas Conley d/b/a Conley Trucking*, 2007 WL 324557, at *10 (citations and footnote omitted). We reject the evidentiary challenge to the administrative law judge's hearsay ruling and turn to the merits of his decision.

As noted above, two of the administrative law judge's findings now at issue relied upon evidence contained in the two affidavits executed by Thompson but later repudiated by him when testifying at the hearing. In the first such finding, the administrative law judge concluded that Conley Trucking improperly "created the impression of surveillance of employees' union activities" when R.J. Conley informed Thompson that he was aware that Thompson, Gilbert, and Steve Delabar "were trying to get a union in here." Because Thompson was not aware of the identity of any other individuals who might have heard R.J. Conley's comment, the suspect affidavit testimony provides the most substantial evidence in support of the unfair labor practice charge, even though Teamster organizer Rick Kepler corroborated the claim by stating that Thompson related that same story to him even before Gilbert was fired by the company. When R.J. Conley himself denied that he ever initiated any conversation with employees about unions, however, the administrative law judge was faced with conflicting testimony that he was charged with reconciling or discrediting in part. Because the administrative law judge was in a much better position to evaluate the credibility of the

contradictory witnesses than we are, "[d]eference to the Board's factual findings is particularly appropriate." *Tony Scott Trucking, Inc.*, 821 F.2d at 315.

In this instance, the administrative law judge credited the testimony in Thompson's affidavits and in Kepler's hearing testimony that R.J. Conley did indeed give Thompson the impression that the company's management was conducting surveillance on the employees interested in unionization. Even though another fact-finder might well have concluded otherwise by giving greater credence to the testimony of other witnesses, substantial evidence still exists in the record as a whole to support the Board's resolution of this issue. *See* 29 U.S.C. §§ 160(e) and (f).

Conley Trucking also challenges the Board's conclusion that Timothy Gilbert was discharged for his union support rather than for his suspect work record. Again, however, substantial evidence adduced before the administrative law judge supports that decision, especially once R.J. Conley's knowledge of Gilbert's union sympathies can be established through admission of Thompson's affidavits.

"Firing an employee because he has engaged in union activity is an unfair labor practice under sections 8(a)(1) and 8(a)(3) of the [Act]." *Ctr. Constr. Co. v. NLRB*, 482 F.3d 425, 435 (6th Cir. 2007). Again, in order to establish such an unfair labor practice, the Board's general counsel must first prove a *prima facie* case of discrimination by showing that: "(1) the employee was engaged in protected activity; (2) the employer knew of the protected activity; and (3) the employee's protected activity motivated the adverse treatment." *Id.* (citing *Temp-Masters, Inc. v. NLRB*, 460 F.3d 684, 689 (6th Cir. 2006)). Upon establishment of that *prima facie* case as enunciated in *Wright Line*, 251 NLRB 1083 (1980), and approved in *Transportation Management Corp.*, "the burden of persuasion switches to the employer to prove that it would have made the same employment decision regardless of the employee's union activity," unless the employer's proffered justification for the employment decision is determined to be pretextual. *Ctr. Constr. Co.*, 482 F.3d at 435. In such a situation, "the Board is not obligated to consider whether the employer would have taken the same decision regardless of the employee's union activity." *Id.* at 436.

In this case, Conley Trucking asserts, as documented by its own "Termination Report," that Gilbert was fired for "Absenteeism/Tardiness." After examining all testimony and documentary evidence, however, the administrative law judge concluded that such a justification was merely a thinly-veiled pretext for prohibited discrimination. As explained by the administrative law judge in his written decision:

> Had Respondent terminated Gilbert, as reflected in the termination report, simply for absenteeism, it would have had the virtue of being consistent with Respondent's demonstrated apathy towards other aspects of Gilbert's performance for months before the discharge. But it would have had the vice (in addition to being inconsistent with Respondent's position at trial) of being a particularly unconvincing explanation of Respondent's decision to take action against Gilbert. [N]umerous other employees had absenteeism records worse than Gilbert's and yet were not discharged. Absenteeism was rife among employees. Indeed, Gilbert was not even among the employees to receive the attendance warning letter developed by Respondent to encourage employees prone to absenteeism "to do a little better."
>
> Attendance was not a plausible reason for Gilbert's discharge. That is why as part of the investigation and in preparation for trial in this case Respondent culled its managers' memory for incidents and shortcomings that could offer a post hoc and legitimate rationale for Gilbert's discharge. In short, Respondent developed a pretext. And even these incidents are suspect. . . . I do not accept the claim that Gilbert did not work the mandatory Saturday. That R.J. Conley would claim that this

was a basis for Gilbert's discharge when the evidence showed that he actually did not know whether Gilbert worked that day speaks volumes about the validity of Respondent's explanation for the discharge offered at trial. I also do not accept that Gilbert had a truck accident with an employee named Floyd, or if he did that it had anything to do with Gilbert's discharge. It is true that Gilbert missed more loads than any other employee, but Respondent did not have documentation developed at the time of Gilbert's discharge to know this with any precision. I recognize that Respondent's managers would have a good feel for which employees miss a lot of loads and no doubt were aware of Gilbert's failings in that regard. But I don't see how they could readily distinguish Gilbert in this regard from, for instance, Thompson, who in fact missed only three less loads than Gilbert. As far as the record reveals, Thompson was never disciplined or threatened with discharge due to missed loads and neither was Gilbert.

What we are left with is that Gilbert was not a stellar employee, who, with his drinking incident, two driving mishaps, poor (but not as bad as many others) attendance, and an abysmal record of missed loads worked steadily without incident until the employer learned (and unlawful[ly] discussed with Thompson) that Gilbert was involved with union activities. Only then was he fired, ostensibly for absenteeism, later expanded to encompass any and all other shortcomings, real or invented for litigation. The Act protects both stellar and poor employees, and those in between, from unlawfully motivated discharge. The salient truth is that Gilbert's many failings as an employee did not endanger his job until the employer discovered Gilbert's union activity. Then he was quickly fired on specious grounds.

I find that Respondent's stated reasons at the hearing for discharging Gilbert are pretextual and an attempt to disguise the fact that antiunion animus was the true motivation for the discharge. This conclusion not only adds further weight to General Counsel's case but pretermits the need to perform the second part of the *Wright Line* analysis. Respondent's discharge of Gilbert violated the Act as alleged.

*Delmas Conley d/b/a Conley Trucking*, 2007 WL 324557, at \*\*26-27. Again, because the administrative law judge was able to point to and credit substantial evidence in the record that supported the conclusion that Gilbert was terminated as a result of his perceived union sympathies, Conley Trucking's challenge to this ruling is also without merit.

### *CONCLUSION*

For the reasons set out above, we DENY the petition for review filed by Delmas Conley, d/b/a/ Conley Trucking, and GRANT the Board's application for enforcement of its decision.