NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0193n.06

Nos. 15-1040/1193

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 06, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LOU'S TRANSPORT, INC., et al., | ) | |
| | ) | |
| Petitioners-Cross-Respondents, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | OF AN ORDER FROM THE |
| | ) | NATIONAL LABOR |
| NATIONAL LABOR RELATIONS BOARD, | ) | RELATIONS BOARD |
| | ) | |
| Respondent-Cross-Petitioner. | ) | |
| | ) | |

**BEFORE: KEITH, COOK, and McKEAGUE, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** Lou's Transport Inc. ("Lou's") and T.K.M.S., Inc. ("TKMS") (collectively, "Petitioners") seek review of a decision of the National Labor Relations Board (the "Board"). The Board concluded that Petitioners terminated Michael Hershey ("Hershey") in violation of Section 8(a)(1) of the National Labor Relations Act (the "Act")[1] after Hershey complained about work conditions. The Board cross-petitioned for enforcement of its order. Because there is substantial evidence in the record to support the Board's decision, the petition for review is **DENIED** and the cross-petition for enforcement is **GRANTED**.

---

[1] 29 U.S.C. § 158(a)(1).

# I.    BACKGROUND

## A. *The Underlying Facts*

Hershey was hired as a truck driver for Lou's in July 2012.[2]  Hershey worked on a site known as the Sylvania Quarry (the "Quarry") beginning in November 2012.  Hershey was represented by a union.

As a driver at the Quarry, Hershey's job consisted of driving from one end of the Quarry to the other end, transporting dirt and clay.  The roundtrip was less than one mile, and Hershey would repeat the process throughout the day.  Most of the roads driven on by the truck drivers were made of clay, dirt, and stone.  Therefore, weather played a critical role in the condition of the Quarry roads at any given time.

The roads were very slippery and become more so when they are wet or thawing after a freeze.  The trucks frequently had flat tires, which the company often replaced with bald tires that were also dangerous.  Trucks often got stuck in the clay.  One of the trucks flipped over at the Quarry, and the trucks operated in close proximity to drops as much as 200 feet.  At some point, every driver complained about the poor condition of the roads to Sean Schmidt, a manager for the Quarry project.

On January 7, 2013, Hershey was talking to another employee, Timothy Pledger ("Pledger") on a company radio.[3]  Hershey and Pledger discussed the poor working conditions. Pledger told Hershey he was forced to pay a traffic fine for driving on bad tires that the company refused to fix.  Hershey explained how he was unable to get new tires from the company until he was pulled over by the police and given a ticket.  Hershey further explained that when he gave

---

[2] The corporate distinction or relationship between Lou's and TKMS is of no consequence to the instant appeal.  The parties stipulated before the Administrative Law Judge that the two entities are jointly and severally liable for any remedies found appropriate in this case regardless of the employment relationship between Lou's and TKMS.  The Board relied upon and accepted this stipulation.

[3] The "company radio" is a two-way radio on which people can transmit and receive communications.

the company the ticket, he was told all truck parts had been on back order for six weeks. Hershey and Pledger also expressed their thoughts that one of the owners of the company, Dan Israel ("Israel"), was cheap for failing to properly maintain the equipment. Profanity was used during this conversation.

Both Hershey and Pledger believed that they were having a private conversation, but David Laming, a sales manager for Lou's, overheard a portion of the conversation. David Laming invited Israel to listen as well, which he did. Hershey testified that the conversation was meant to be a private conversation, and he apologized to David Laming for making it public. Hershey also said to David Laming, "[L]ook, dude, I'm here, I'm working, but I have issues with my safety, so I'm going to say something about it."

David Laming wanted to terminate Hershey after the conversation, but Israel persuaded him not to do so. The next day, David Laming met with Hershey and Pledger. David Laming asked, "[W]hy are you still here[?]" He also told them that the company spends "a lot of money and equipment to repair things, and if [Hershey and Pledger] have a problem, [they] need to find a different place to work." He stated that "[i]f . . . per your conversation you think this is a terrible place to work, you know, I would never work anywhere that I wasn't happy working, and why do you work here?" Both Hershey and Pledger received a verbal warning, but neither employee was discharged. The verbal warning was memorialized in writing. The paperwork reflects that Hershey received a verbal warning for badmouthing the company and for improper language on the company radio. Hershey was also offered another position that would have taken him out of the Quarry, but Hershey declined the relocation because he would make more money in his current position.

Sometime later, Hershey began displaying hand-written signs in his truck regarding the working conditions and other unrelated matters. After Hershey began displaying the signs, one day in February 2013, the drivers collectively refused to continue working because the road conditions were unsafe.

On March 25, 2013, a safety meeting was held at which the owner of the Quarry, Bill Begley, addressed all employees. At the meeting, Hershey stated that the drivers were upset because of the dangerous road conditions.

Two days later, on March 27, 2013, Jeffrey Laming, TKMS's Operation Manager, became aware that drivers were talking about Hershey's signs. Jeffrey Laming and Schmidt checked Hershey's truck and found sixteen signs. Some of the signs referred to the poor working conditions at the Quarry; others did not.

Jeffrey Laming contacted David Laming, his brother, and told him about the signs. The two also discussed the January 7 radio conversation and concluded that Hershey was "still talking bad" about the company. David Laming testified that the signs were "especially inappropriate following the discussion" he had with Hershey in January about "badmouthing the company." The brothers decided that "enough's enough." Hershey was fired that same day. Regarding the termination, David Laming testified as follows:

> A. I wasn't happy because, you know, I'd already spoken to [Hershey] about conversations over the radio. Then I saw these signs, and I thought about, you know, these are out there, our customers see them, you know. . . . [I]t was just like, you know, this isn't – this isn't the kind of person we want working for us. So I told Jeff Laming it probably'd be best if we terminate him.
> . . . .
> Q. And that was due to the signs?
> A. Yes.
> Q. And also the fact that you had previously spoken to him regarding his behavior?
> A. Yes, correct.
> . . . .

A. I felt that he wasn't the type of person we wanted working for us. He continually showed behavior of badmouthing the company and not doing the right thing, or what I would consider the right thing, which is represent the place you're employed like you're proud to be there and you want to be there.
. . . .
Q. Okay. And then he was terminated based on the signs and the previous verbal warning reprimand for badmouthing the company over the radio, correct?
A. Yes.

Similarly, Jeffrey Laming testified that Hershey was discharged "because of the sign[s]," which evinced "continued" behavior of "disparaging the company" in light of the previous radio conversation. The Board filed a charge against Petitioners, and the Administrative Law Judge ("ALJ") concluded that Petitioners had violated the Act in firing Hershey for the radio incident and for the signs. Petitioners filed the following exceptions to the ALJ's findings with the Board: (1) Petitioners argued that Hershey was not fired for the January 7 radio incident and (2) Petitioners argued that the signs were not a protected activity.

### B. The Board's Decision

On December 16, 2014, the Board issued its Decision and Order. The Board concluded that Petitioners had violated Section 8(a)(1) of the Act when they discharged Hershey. Specifically, the Board concluded that Hershey was fired for displaying the signs *and* for his January 7 radio conversation with a fellow driver. The Board concluded that the radio conversation was unquestionably a protected activity. The Board also concluded that even assuming that Hershey had only been fired for the signs, the discharge would still be unlawful. The Board stated that regardless of whether displaying the signs was a protected activity, because the Petitioners *believed* it was a protected activity, the termination was unlawful. Petitioners now seek review of the Board's decision, and the Board cross-petitions for enforcement of its order.

5

## II.     DISCUSSION

### A.  Jurisdiction

The Board "has jurisdiction 'to prevent any person from engaging in any unfair labor practice.'" *Meijer, Inc. v. NLRB*, 463 F.3d 534, 538 (6th Cir. 2006) (quoting 29 U.S.C. § 160(a)). Additionally, "[t]his court has jurisdiction over petitions to review or enforce orders issued by the NLRB." *Id.* at 539 (quoting *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 752 (6th Cir. 2003)). "There is no statutory time limit for filing a petition for review of a final order of the NLRB." *Id.* (citing 29 U.S.C. § 160(e), (f)).

### B.  Standard of Review

"The legal conclusions of the Board are entitled to deference" because of the "Board's special function of applying the general provisions of the Act to the complexities of industrial life." *Id.* at 539. The Board may "fashion general rules for application to generic labor disputes." *Id.* at 542. Further, "[t]he rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." *Id.* at 539 (quoting *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978)). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).

Similarly, "[t]he factual findings of the Board must be upheld if supported by substantial evidence on the record considered as a whole." *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995). "Where the evidence supports two conflicting views, we may not disturb the Board's findings and its order must be enforced." *Id.*

### C. Analysis

Section 7 of the Act "grants employees the right 'to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'" *Meijer*, 463 F.3d at 539 (quoting 29 U.S.C. § 157). Section 8(a)(1) of the Act "makes it an unfair labor practice for an employer to interfere with employees exercising the right guaranteed them by § 7 of the Act[.]" *W.F. Bolin*, 70 F.3d at 870. "Improper employer motivation may be inferred from circumstantial as well as direct evidence." *Id.* at 871. "[T]he Board is not required to accept an employer's self-serving declarations even when credited by the administrative law judge, but may draw its own inferences, giving such statements the weight it deems appropriate[.]" *Id.* at 874 (quoting *NLRB v. Brooks Cameras, Inc.*, 691 F.2d 912, 915 (9th Cir. 1982)).

In order to establish "an unfair labor practice" under Section 8(a)(1) of the Act, the Board must first prove a prima facie case of discrimination by showing that:

(a) the employee was engaged in protected activity;

(b) the employer knew of the protected activity; and

(c) the employee's protected activity motivated the adverse treatment.

*See Conley v. NLRB*, 520 F.3d 629, 642 (6th Cir. 2008).

The activity must also be concerted. *NLRB v. Lloyd A. Fry Roofing Co., Inc.*, 651 F.2d 442, 445 (6th Cir. 1981). "Concerted" means "related to group action for the mutual aid or protection of other employees." *Id.* But it is also "well settled that 'an individual employee may be engaged in concerted activity when he acts alone.'" *NLRB v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 539 (6th Cir. 2000) (quoting *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 831

(1984)). An employee, for example, may act alone but "on behalf of other employees" or "with the object of inducing or preparing for group action." *Id.* "Protests of wages, hours, other working conditions and the presentation of job-related grievances are for the mutual aid and protection of employees." *Lloyd A. Fry Roofing Co., Inc.*, 651 F.2d at 445. After the Board makes out the prima facie case, "the burden of persuasion switches to the employer to prove that it would have made the same employment decision regardless of the employee's union activity[.]" *Conley*, 520 F.3d at 642-43 (quoting *Ctr. Const. Co. v. NLRB*, 482 F.3d 425, 435 (6th Cir. 2007)).[4]

When an ALJ issues a written determination regarding a labor dispute under the Act, it is incumbent upon the parties to file exceptions to any contested portion of the determination with the Board in order to preserve the issue. 29 C.F.R. § 102.46. Otherwise, the issue is deemed waived. *See id.* § 102.46(b)(2) ("Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived."). And a similar limitation applies when a party fails to urge an issue before the Board even after the Board issues its decision and order. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982). Where a petitioner could have raised an issue before the Board in a motion for reconsideration, a failure to do so "prevents consideration of the [issue] by the courts." *Id.*; *accord* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

Here, the Board's determination was two-fold: First, the Board concluded that Petitioners violated the Act because Hershey's radio conversation was a protected activity and

---

[4] If, however, the employer's proffered reason is determined to be pre-textual, "the Board is not obligated to consider whether the employer would have [made] the same decision regardless of the employee's union activity." *Id.* at 643.

was a reason for his termination. Then, the Board concluded that Petitioners violated the Act for a second and separate reason—Hershey's signs were also a reason for his termination and Petitioners believed that he was engaged in concerted protected activity by displaying the signs. The Board did not make a separate finding on whether the display of the signs indeed constituted concerted protected activity. Because there is substantial evidence in the record supporting the Board's conclusion that Petitioners violated the Act with respect to the radio conversation, we need not reach the merits of the claim regarding Hershey's display of the signs. *See Meijer*, 463 F.3d at 539 (noting that we only determine whether the Board's decision is supported by substantial evidence on the record as a whole).

**The Radio Conversation**

**(a)** *Concerted Protected Activity*

The ALJ found that the radio conversation was a concerted protected activity. On appeal, Petitioners admit that they did not take exception to this finding. The Board agreed that the radio conversation was concerted protected activity. Because Petitioners failed to file an exception to the ALJ's finding on this issue, we cannot consider any argument that the radio conversation was not protected activity on appeal absent "extraordinary circumstances." *Conley*, 520 F.3d at 638; *accord* 29 U.S.C. § 160(e). Petitioners have not argued that any extraordinary circumstances exist, and Petitioners' failure to present this issue to the Board constitutes a jurisdictional limitation. *See Woelke*, 456 U.S. at 665-66. Accordingly, we are compelled to conclude, without deciding, that the radio conversation was concerted protected activity because the issue is unreviewable on appeal.[5] *See Conley*, 520 F.3d at 638-39.

---

[5] Petitioners argued in their reply brief that the Board "opened the door" to the issue of whether the radio conversation was a protected activity by "presenting arguments on that issue in this appeal." Petitioners misapprehend the meaning and scope of the term "opening the door." First, the Board did not open the door to the issue. "It is true that where an appellee has made an argument not addressed by the appellant, the appellant may

**(b)** *Knowledge of the Protected Activity*

Petitioners argue on appeal that even if the radio conversation was concerted protected activity, the Board did not conclude that Petitioners had knowledge that the conversation was a protected activity. In support, Petitioners argue that one of our prior cases, *Meijer*,[6] requires a separate finding of knowledge on the part of the employer in every case involving a Section 8(a)(1) violation of the Act. In *Meijer*, we abrogated a Board rule that altogether eliminated any subjective component of a Section 8(a)(1) violation. 463 F.3d at 539-40. We held that some subjective component is required. *See id.*

Nevertheless, Petitioners did not raise any argument concerning a finding of knowledge before the Board. Accordingly, we are jurisdictionally barred from considering this new argument on appeal as well. *See S. Moldings, Inc. v. NLRB*, 728 F.2d 805, 806 (6th Cir. 1984) (en banc); *accord* 29 U.S.C. § 160(e).

Notwithstanding their failure to raise the issue before the Board, Petitioners assert that there was no opportunity to raise the issue before the Board for two reasons: one, the ALJ did not make a finding with respect to knowledge, so there was no finding to which the Petitioners could except; and two, it was not apparent that the Board failed to make a finding with respect to knowledge until after the Board rendered its decision. Petitioners' argument evinces a misunderstanding of the applicable jurisdictional bar. Our *Southern Moldings* opinion clarifies the point. In that case, the court was asked to decide the question of whether one of our prior cases "should be interpreted to require the [Board] . . . to make explicit findings and

---

respond to it." *United States v. Wilson*, 27 F.3d 1126, 1131 n.4 (6th Cir. 1994). However, that is not what occurred here. Here, the Board merely highlighted what the Petitioners had already admitted in their opening brief. Second, the concept of "opening the door" is not as far-reaching as Petitioners suggest—the Board cannot "open the door" in such a way as to excuse the jurisdictional bar of the issue. *See id.* ("Merely stating what is not in dispute does not place the issue in dispute absent it being raised at the proper time."); *see also Woelke*, 456 U.S. at 666 (reiterating that the failure to urge the issue before the Board "prevents consideration of the question by the courts").
[6] *Meijer, Inc. v. NLRB*, 463 F.3d 534 (6th Cir. 2006).

conclusions" regarding elections prior to the issuance of a bargaining order. 728 F.2d at 806. In an en banc ruling, we concluded that we lacked jurisdiction to consider the question under *Woelke* and 29 U.S.C. § 160(e) because "this specific issue was not raised before the Board prior to its decision, *or upon reconsideration.*" *Id.* (emphasis added); *see also Wal-Mart Stores, Inc. v. NLRB*, 136 F. App'x 752, 754-55 (6th Cir. 2005) (holding that judicial review of an issue was barred because it was raised for the first time on appeal).

*Southern Moldings* makes clear that it was incumbent upon the Petitioners to raise the issue of knowledge before the Board, even if the first opportunity to do so would have been in a motion for reconsideration after the Board issued its order. *See* 728 F.2d at 806. Petitioners simply failed to do so. The Petitioners did not assert any extraordinary circumstances to excuse this failure.

### (c) *Protected Activity Is a Motivating Factor in the Adverse Action*

"In this Circuit, if a discharge is motivated 'in part' by an employee's protected concerted activities the discharge violates section 8(a)(1) of the Act." *Lloyd A. Fry Roofing Co. Inc.*, 651 F.2d at 445 (quoting *Vic Tanny Int'l, Inc. v. NLRB*, 622 F.2d 237, 241 (6th Cir. 1980)). Before the Board, Petitioners contended that Hershey had been fired solely for displaying the signs in his truck, not for the radio conversation. The Board, however, found that "Hershey was fired for displaying the signs *and* for his January 7 radio conversation with a fellow driver." This conclusion is supported by substantial evidence in the record because both Jeffrey Laming and David Laming admitted that Hershey had been fired for both incidents. Specifically, Jeffrey Laming testified that after he found the signs in Hershey's truck he was concerned because Hershey had now showed "continued" behavior of "disparaging the company." Further, David Laming testified as follows:

11

A. I felt that he wasn't the type of person we wanted working for us. He continually showed behavior of badmouthing the company and not doing the right thing, or what I would consider the right thing, which is represent the place you're employed like you're proud to be there and you want to be there.
. . . .
Q. *Okay. And then he was terminated based on the signs and the previous verbal warning reprimand for badmouthing the company over the radio, correct?*
A. *Yes.*

We have long held that an employer's admissions can support a finding of a Section 8(a)(1) violation. *See Turnbull Cone Baking Co. of Tenn. v. NLRB*, 778 F.2d 292, 297 (6th Cir. 1985) ("The Board may rely on all the evidence, including direct admissions as well as circumstantial evidence, in determining actual motive."). Accordingly, David's unequivocal statement that Hershey was fired, in part, for the radio conversation lends sufficient support for the Board's finding that Hershey was terminated because of the radio conversation. This conclusion is bolstered by the fact that both David and Jeffrey testified that it was Hershey's "continued" behavior of badmouthing the company that led to his firing. Viewing these statements in context reveals that Jeffrey and David were alluding to the radio incident for which Hershey received a verbal reprimand. Accordingly, the Board's finding that Hershey was terminated, at least in part, because of the radio conversation is supported by substantial evidence in the record.

Granted, at other times during their testimonies, Jeffrey and David said that the signs were the reason for Hershey's termination. However, even if their testimonies could support a "conflicting" view, the court "may not disturb the Board's findings and its order must be enforced" where there is still substantial evidence in the record supporting the Board's conclusion. *Main St. Terrace Care Ctr.*, 218 F.3d at 537. Because the radio conversation is, by concession, a concerted protected activity, and because the discharge was motivated in part by the radio conversation, the Board's conclusion that a violation of Section 8(a)(1) occurred is

supported by substantial evidence in the record. *See, e.g.*, *Jim Causley Pontiac v. NLRB*, 620 F.2d 122, 126 (6th Cir. 1980) ("[I]f the discharge was motivated in part by the protected activity, then a violation of Section 8(a)(1) has occurred.").

### III.    CONCLUSION

For the foregoing reasons, the petition for review is **DENIED** and the cross-petition for enforcement is **GRANTED**.