RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0307p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LOU'S TRANSPORT, INC.; T.K.M.S., INC.,
        *Petitioners/Cross-Respondents*,

     *v.*

NATIONAL LABOR RELATIONS BOARD,
        *Respondent/Cross-Petitioner*.

> Nos. 18-1909/1988

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board;
No. 07-CA-10257.

Argued: June 20, 2019

Decided and Filed: December 26, 2019

Before: BOGGS, MOORE, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Steven A. Wright, STEVEN A. WRIGHT, P.C., Shelby Township, Michigan, for Petitioners/Cross-Respondents. Steven Bieszczat, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** Steven A. Wright, Sandra L. Wright, Amy D. Comito, STEVEN A. WRIGHT, P.C., Shelby Township, Michigan, for Petitioners/Cross-Respondents. Steven Bieszczat, Elizabeth Heaney, Linda Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.  In 2016, we held that Petitioners Lou's Transport, Inc. and T.K.M.S., Inc. (collectively, Lou's or the Company) violated the National Labor Relations Act (NLRA or the Act) by terminating Michael Hershey.  *See Lou's Transp., Inc. v. NLRB*, 644 F. App'x 690 (6th Cir. 2016).  More than three years after that decision (and more than six years after the wrongful termination), Lou's continues to dispute the amount of back pay that Hershey is owed.

An administrative law judge (ALJ) entered a back pay order against Lou's, and the National Labor Relations Board (NLRB or the Board) upheld the order in its entirety.  Lou's petitions for review, raising numerous challenges to the NLRB's calculations and order.  The Board has broad discretion to resolve factual disputes and to select formulas to calculate uncertain figures such as back pay.  Because the Board did not abuse that discretion, we **DENY** the Company's petition for review and **GRANT** the General Counsel's cross-petition for enforcement.

## I.     BACKGROUND

Our prior decision sets out the facts, which are briefly summarized here.  Michael Hershey worked as a truck driver for Lou's under a collective bargaining agreement (CBA) from July 2012 until he was fired in March 2013.  *Lou's Transp.*, 644 F. App'x at 691–92.  In January 2013, Hershey used a company radio to "discuss[] the poor working conditions" at Lou's with another driver.  *Id.* at 691.  Thereafter, "Hershey began displaying hand-written signs in his truck regarding the working conditions and other unrelated matters."  *Id.* at 692.  At a safety meeting in March, Hershey "stated that the drivers were upset because of the dangerous road conditions."  *Id.*  Two days later, Lou's managers searched Hershey's truck, found 16 signs, and fired him.  *Id.*  We upheld the Board's finding that Hershey was terminated at least in part because of the January radio conversation.  *Id.* at 697.  We also "conclude[d], without deciding, that the radio

conversation was concerted protected activity" under the NLRA, citing the Company's failure to contest that argument in administrative proceedings. *Id.* at 695.

In November 2015, while the appeal before our court was pending, the NLRB Regional Director issued an initial Compliance Specification, laying out the methodology for calculating the back pay award. For over a year after the appeal was decided, the parties went back and forth, with Lou's filing answers and raising objections, and the Director requesting further documentation and amending its calculations. All in all, the Director issued four amended specifications, the last of which was dated August 14, 2017. A damages hearing was scheduled for September 18, 2017. Citing the addition of retirement benefits to the Third Amended Compliance Specification (dated August 3, 2017), Lou's moved to postpone the hearing and requested extra time to file its answer. The Chief ALJ granted Lou's a three-day extension but rejected the motion to reschedule, explaining that the "time has long past" to resolve the issue of damages suffered by Mr. Hershey because of the Company's discrimination.

When the hearing began on September 18, the ALJ granted the General Counsel's motion to correct mathematical errors in the Fourth Amended Compliance Specification, without objection from Lou's. Lou's amended its answer, also without objection. The ALJ then heard testimony from three witnesses: Hershey; a Company general manager, David Laming; and an NLRB field examiner, Daniel Molenda, who had performed the back pay calculations. Molenda testified that Lou's owed Hershey a total of $49,817. That figure was based on four categories: (1) Hershey's "adjusted net back pay," the projected earnings at Lou's had Hershey not been fired, less his interim earnings at other positions and an assumed contribution to his retirement account; (2) foregone bonuses awarded to Lou's employees; (3) expenses incurred at Hershey's interim employment; and (4) the lost value of Hershey's retirement account.

In January 2018, the ALJ issued a decision adopting Molenda's calculations. Lou's appealed, and the NLRB affirmed on all grounds. Lou's petitions for review, raising each of the arguments considered and rejected by the ALJ and the Board. The General Counsel cross-petitions for enforcement of the Board's order.

## II.    ANALYSIS

The NLRA includes a "broad command" that, "upon finding that an unfair labor practice has been committed, the Board shall order the violator 'to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies' of the Act." *NLRB v. J.H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 262 (1969) (quoting 29 U.S.C. § 160(c)).  The remedial power the NLRB derives from this NLRA provision is "a broad, discretionary one, subject to limited judicial review."  *NLRB v. Jackson Hosp. Corp.*, 557 F.3d 301, 306 (6th Cir. 2009) (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964)).  We may not disturb the Board's back pay order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *NLRB v. Overseas Motors, Inc.*, 818 F.2d 517, 520 (6th Cir. 1987) (quoting *Fibreboard*, 379 U.S. at 216).

The Supreme Court has identified "ends" that effectuate the Act.  Back pay is both "a remedy designed to restore, so far as possible, the status quo that would have obtained but for the wrongful act" and also a "punishment for an unfair labor practice."  *Rutter-Rex Mfg.*, 396 U.S. at 265; *see also NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 175 (2d Cir. 1965) ("The back pay remedy has the twofold purpose of reimbursing employees for actual losses suffered as a result of a discriminatory discharge and of furthering the public interest in deterring such discharges."). Though back pay awards "somewhat resemble compensation for private injury, . . . it must be constantly remembered that [the back pay remedy is] created by statute . . . to aid in achieving the elimination of industrial conflict.  [It] vindicate[s] public, not private rights."  *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 543 (1943).

The choice of a calculation method is likewise committed to the NLRB's sound discretion.  Because "[a] back pay award is only an approximation, necessitated by the employer's wrongful conduct[,] . . . there may be several equally valid methods of computation, each yielding a somewhat different result."  *Overseas Motors*, 818 F.2d at 520 (quoting *Bagel Bakers Council of Greater N.Y. v. NLRB*, 555 F.2d 304, 305 (2d Cir. 1977) (per curiam)).  The Board "is required only to adopt a formula which will give a close approximation of the amount due," and choosing "to proceed by one method rather than another hardly makes out a case of

abuse of discretion." *Id.* at 520-21 (second quote quoting *Bagel Bakers Council*, 555 F.2d at 305). "Any formula which approximates what discriminatees would have earned had they not been discriminated against is acceptable if it is not unreasonable or arbitrary in the circumstances." *La Favorita, Inc.*, 313 N.L.R.B. 902, 902 (1994).

The factual findings underpinning those calculations must be upheld "as long as those findings are supported by substantial evidence in the record as a whole." *NLRB v. S.E. Nichols of Ohio, Inc.*, 704 F.2d 921, 923 (6th Cir. 1983) (per curiam); *see also Airgas USA, LLC v. NLRB*, 916 F.3d 555, 560 (6th Cir. 2019). This threshold "is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

We consider Lou's objections in light of these standards.

**A.        Gross Back Pay**

The first step in calculating a back pay award is determining the gross back pay, "the amount of money that the employee would have earned had the employer not violated the National Labor Relations Act." *Jackson Hosp.*, 557 F.3d at 307. The burden of establishing the amount of gross back pay is on the General Counsel. *See id.* Lou's alleges three errors at this step.

1.        Underline End Date

The parties agree that the back pay period begins on March 27, 2013, the day Hershey was discharged. They dispute when the period ends.

Back pay ceases accruing when an employer makes a sufficient offer of reinstatement and is rejected. *See id.* at 309.

> [D]etermining the sufficiency of a reinstatement offer has two steps: (1) there must be a genuine offer of full reinstatement that (a) restores seniority or other benefits accrued by the employee, (b) is permanent, and not temporary, and (c) gives the employee sufficient time to accept; and (2) this genuine offer of full and permanent reinstatement must be specific, unequivocal, and unconditional.

*Id.* at 310 (brackets, citations, and internal quotation marks omitted). The General Counsel determined that Lou's made a satisfactory offer on August 22, 2016.

Lou's argues that its back pay obligation should have been tolled on November 24, 2014. At an administrative hearing held on that date, Hershey was asked, "Don't want to be reinstated for Lou's, do you?" and responded, "Oh, God, no." Lou's argues that Hershey's expressed unwillingness to return showed that an offer of reinstatement from Lou's would have been futile. Lou's cites no caselaw to support the proposition that it is excused from making a reinstatement offer that it deems futile. And that subjective inquiry is at odds with our objective evaluation of such offers. A proper reinstatement offer specifies how and under what circumstances an employee would return to work for an employer who discriminated against him. The question put to Hershey in November 2014 is akin to one we have cited as an example of insufficiency: "Are you willing to come back to work for us if we need you?" *NLRB v. Seligman & Assocs., Inc.*, 808 F.2d 1155, 1161 (6th Cir. 1986) (citing *Corrugated Partitions West, Inc.*, 275 N.L.R.B. 894, 907 (1985)). The insufficiency is even clearer here, as the attorney examining Hershey was not a company official who could "indicate the availability of the former or a comparable position," *id.*, much less unequivocally offer it.

The Board correctly analyzed the sufficiency of the reinstatement offer and did not abuse its discretion by awarding back pay through August 22, 2016.

2.          Comparable Employees

The General Counsel's next task was estimating the hours that Hershey would have worked had he remained at Lou's. Unlike many hourly employees, Lou's truck drivers do not work a set number of hours each week. Instead, Lou's contracts with customers for trucking jobs and assigns work hours on a job-by-job basis, according to that customer's needs. The type and number of jobs vary; for example, a Company manager testified that fewer jobs are available during the slower winter season. The process for placing drivers in jobs is not clear in the record, but drivers sometimes volunteered and it appears that seniority is a factor.

To recreate the number of hours that Hershey would have worked had he remained at Lou's, Molenda selected Ronny Smith and Gary Forsyth, two employees hired the year before

Hershey, and assumed the average of their hours. Molenda explained that he chose Smith and Forsyth because the two were the closest in seniority to Hershey, drove the same type of vehicle as Hershey, and did not have unexplained gaps in their employment. This model parallels the approved "representative employee" approach. *See Overseas Motors*, 818 F.2d at 520.

Lou's does not argue that this model is flawed. Instead, it submits that the General Counsel should have used Kevin Moore on the basis that he is a better comparator because he was hired less than two months before Hershey. Molenda testified that he did not use Moore as a comparator because there were two large unexplained gaps in his employment: Moore did not work from January to March in either 2014 or 2016. Lou's argues that the General Counsel should have assumed Hershey would not have worked during those times either because he had less seniority than Moore.

This presents a factual question: Did Smith and Forsyth work while Moore (and presumably Hershey) did not because the former had seniority? We are bound to uphold the Board's resolution of a factual question if it is "supported by substantial evidence in the record as a whole." *S.E. Nichols*, 704 F.2d at 923. The ALJ inferred that seniority was not the decisive factor based on the example of Jeffrey Clem. Clem was hired in 2003, nine years before Moore, and despite his substantial seniority, Clem had the same long gaps in employment as Moore. Because both a junior and a senior driver had employment gaps, the ALJ could reasonably infer that seniority was not the decisive factor. Significantly, the ALJ noted that had there been an overall decrease in labor hours for quad axle drivers, Lou's would have been in a position to provide that evidence. Lou's did not offer that or other supporting evidence.

Because a reasonable mind could accept that evidence as adequate, *see Biestek*, 139 S. Ct. at 1154, the NLRB's conclusion that Moore's employment gaps were not due to seniority is supported by substantial evidence. We discern no abuse of discretion in using Smith and Forsyth as comparators.

3.      Wage Rate

The final step of determining Hershey's gross back pay award was establishing the wage rate. Molenda could not simply average Smith and Forsyth's paychecks because the CBA

mandated step increases in payment based on seniority—for example, $16.25 per hour for a third-year employee and $16.75 for a fourth-year. To compensate for the one-year difference in seniority, Molenda assumed that when Smith and Forsyth were paid at their contractual levels (for example, $16.75), Hershey would have been paid at his lower contractual level (for example, $16.25). But on certain occasions, Smith received more than his contractual rate—for example, $17.39 or $18.75 when the base rate was $16.75. In those instances, Molenda assumed Smith was working prevailing wage jobs, such that Hershey would have received the same elevated rate.[1] Lou's alleges two errors in this approach.

First, Lou's argues in passing that the General Counsel did not actually use the contractual wage rates. But in making this argument, Lou's cites its own spreadsheets, not Molenda's. The spreadsheets attached to the final version of the Fourth Amended Compliance Specification, as amended at the beginning of the damages hearing, use the contractual rates that Lou's deems appropriate.

Second, Lou's argues that the periodic increases in wages reflect bonus pay for training, not prevailing wage work, citing testimony from a Company manager that Smith sometimes received an extra two dollars per hour for training new drivers. The manager also could not recall any prevailing wage job the Company did during the back pay period. Hershey, by contrast, testified that he had trained a new employee for Lou's without receiving any bonus pay and that Lou's had several prevailing wage jobs available. The ALJ credited the General Counsel's explanation (and Hershey's testimony) over the Company's.

Once again, we are bound to uphold the Board's resolution of this factual dispute if its conclusion is "supported by substantial evidence in the record as a whole." *S.E. Nichols*, 704 F.2d at 923. "We may not supplant such a factual finding even if we identify 'an alternative conclusion that could be supported by substantial evidence.'" *Taylor Warehouse Corp. v. NLRB*, 98 F.3d 892, 899–900 (6th Cir. 1996) (quoting *Vemco, Inc. v. NLRB*, 79 F.3d 526, 528 (6th Cir.

---

[1]During the back pay period, Michigan's prevailing wage law required contracts for state construction projects to set wages at "rates prevailing in the locality in which the work is to be performed." Mich. Comp. Laws § 408.552 (2017). The prevailing wage law was repealed in 2018, after this back pay period ended. *See* 2018 Mich. Pub. Acts 171.

1996)).  Here, the ALJ gave two reasoned explanations for awarding Hershey the higher rates. First, a flat premium of two dollars per hour does not explain pay increases that were not in two-dollar increments, such as an hourly rate jump from $16.75 to $16.93 or $17.39.  Second, if the increases were a training premium, Hershey had 35 years of driving experience and could have qualified for that role.

Because a reasonable mind could accept those explanations as adequate, *see Biestek*, 139 S. Ct. at 1154, the Board's wage rates were supported by substantial evidence and are not an abuse of discretion.

**B.      Deductions**

After gross back pay has been determined, the burden shifts to the employer to "establish[] deductions from gross back pay."  *S.E. Nichols*, 704 F.2d at 924; *see also NLRB v. Akron Paint & Varnish Co.*, 985 F.2d 852, 854 (6th Cir. 1992) (per curiam).  Lou's raises three potential errors concerning this stage of the calculation.

1.      Uniform Fees, Union Dues, and Unemployment Benefits

First, Lou's argues that the Board erred by failing to deduct uniform fees, union dues, and unemployment benefits from Hershey's back pay award.

With regard to the uniform fees and union dues, the ALJ explained that the Company's discriminatory discharge of Hershey "prevented him from enjoying any benefits of being a union member" or wearing the uniform.  Lou's offers no response to this logic, instead attacking the ALJ's alternate rationale related to timeliness.  We need not address that question, as Lou's raised no challenge to the contractual-benefit rationale, which suffices to uphold the Board's conclusion.

Turning to unemployment benefits, the Supreme Court held nearly 70 years ago that the Board is empowered to "refus[e] to deduct . . . unemployment compensation payments from back pay, and that in so doing the Board d[oes] not abuse its discretion."  *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 364 (1951).  Lou's offers no argument distinguishing this binding precedent.

2.          Interim Overtime

Next, Lou's takes issue with the General Counsel's treatment of interim overtime, arguing that excess overtime should have been calculated on a quarterly, rather than weekly, basis.

"Excess overtime" has long been an exception to the general rule that interim earnings are deducted from gross back pay. *See United Aircraft Corp.*, 204 N.L.R.B. 1068, 1073 (1973). This exception avoids "the ridiculous anomaly whereby an assiduous and diligent backpay claimant would be penalized for toiling a 24-hour day whereas a shirker would be rewarded." *Id.* (citation omitted). Assume that an employee is fired from a 40-hour-a-week position, finds interim employment at a lower wage, and, to maintain the same wage, works an extra eight-hour shift each week. If her former employer is allowed to base deduction calculations solely on dollars earned, her extra effort each week redounds to the benefit of her discriminating employer, contrary to the goals of the NLRA. "Earnings from such extra effort, whether exerted on 'excess overtime' or a 'moonlighting' job, should operate to the advantage of the backpay claimant, not of the employer required to make him whole for a discriminatory discharge." *Id.*

Lou's does not dispute that excess overtime is an exception to the deduction rule. The argument raised regards whether the Board should calculate the amount of excess overtime on a weekly or a quarterly basis. Arguments about specificity of calculation frames are not new to back pay disputes. Nearly 70 years ago, the Board repudiated the practice of awarding lump sum back pay awards (deducting total interim earnings from total foregone earnings) in favor of quarterly calculations. *See F.W. Woolworth Co.*, 90 N.L.R.B. 289, 291–94 (1950). More precise calculation was necessary because, if a discharged employee found higher-paying interim work, a "recalcitrant employer" could "deliberately refrain[] from offering reinstatement, knowing that the greater the delay, the greater would be the reduction in back-pay liability." *Id.* at 292. Lou's argues that, in line with this precedent and Molenda's calculation of every other element of damages on a quarterly basis, excess overtime should have been calculated by the quarter.

Lou's framing is somewhat misleading. Molenda did calculate some aspects of the award (such as interim expenses and retirement benefits) on a quarterly basis. But, as discussed above,

Molenda provided week-by-week details on wages and hours that Hershey would have received had he remained at Lou's. The weeks were then added together to yield quarterly totals. Molenda used the same week-by-week approach when deducting interim earnings and calculating excess overtime.

But more fundamentally, Lou's has cited no case, and we are aware of none, holding that excess overtime *must* be calculated on a quarterly basis. *Woolworth* itself did not involve excess overtime. Even if it had, it sets a floor for specificity, not a ceiling. *See* 90 N.L.R.B. at 293 (requiring deductions be taken from the earnings a petitioner "would normally have earned for each such quarter *or portion thereof*" (emphasis added)). Courts resolving overtime disputes both before and after *Woolworth* have adopted flexible approaches depending on the circumstances of each case. *See, e.g.*, *NLRB v. Miami Coca-Cola Bottling Co.*, 360 F.2d 569, 573 (5th Cir. 1966) (a six-week moonlighting job); *Seattle Seahawks*, 304 N.L.R.B. 627, 627 (1991) (two postseason football games), *enf. denied on other grounds*, *Tubari, Ltd. v. NLRB*, 959 F.2d 451 (3d Cir. 1992); *United Growers, Inc.*, 59 N.L.R.B. 549, 550 (1944) (seasonal periods when business was not operational). These flexible approaches have included weekly calculations, *see, e.g.*, *Kawasaki Motors Corp.*, 282 N.L.R.B. 159, 164 (1986), and the Board's manual provides an example of weekly excess-overtime calculation, *see* 3 *NLRB Casehandling Manual* § 10554.3 (June 2018), https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-1727/chm3_0.pdf.

Board precedent guides the decision of which model to use on the facts of this case. "Where a respondent offers an alternative formula for determining backpay, the Board must decide which is the 'most accurate' method." *Atl. Veal & Lamb, Inc.*, 355 N.L.R.B. 228, 228 n.5 (2010) (quoting *Woodline Motor Freight, Inc.*, 305 N.L.R.B. 6, 6 n.4 (1991)). Weekly totals are, as a general matter, more accurate than quarterly averages. Zooming in for a week-by-week calculation may have introduced some error, as biweekly timesheets had to be divided across two different weeks. But the Company's preferred resolution (lumping multiple timesheets into a single quarterly figure) also introduces error: It ignores real excess overtime hours that Hershey worked. This unavoidable ambiguity "should be resolved in favor of the wronged party rather than the wrongdoer." *Kan. Refined Helium Co.*, 252 N.L.R.B. 1156, 1157 (1980); *see also*

*United Aircraft, Corp.*, 204 N.L.R.B. at 1068 ("[T]he backpay claimant should receive the benefit of any doubt rather than the [employer], the wrongdoer responsible for the existence of any uncertainty and against whom any uncertainty must be resolved.").**[2]**

Against this flexible background and these underlying principles, the Board's choice "to proceed by one method rather than another," *Overseas Motors*, 818 F.2d at 520 (quoting *Bagel Bakers Council*, 555 F.2d at 305)), did not amount to an abuse of discretion.

### 3. Interim Wages

Lou's devotes a single paragraph to arguing that the NLRB used incorrect wage rates for Hershey's interim employment. The contours of this underdeveloped argument are difficult to discern. The Company may be taking issue with Molenda's division of biweekly paychecks evenly across two weeks. But Lou's does not explain why this was an unreasonable method. Lou's also notes that for certain weeks, its calculations yielded different weekly figures than Molenda's. Different totals are to be expected because, as was discussed above, Molenda discounted excess overtime hours and Lou's did not. Because Lou's has not pointed to any evidence demonstrating that its figures are accurate and Molenda's are not, we see no basis to find an abuse of discretion.

## C.    Interim Expenses

As a separate component of the back pay award, the Board ordered Lou's to reimburse Hershey for the expenses he incurred traveling to and from his interim employment after his wrongful termination. "[T]he burden of proof is on the General Counsel to prove expenses . . . ." *D.L. Baker*, 351 N.L.R.B. 515, 538 (2007).

Interim employment expenses have been factored into back pay awards for more than 80 years. *See Crossett Lumber Co.*, 8 N.L.R.B. 440, 497–98 (1938). Awarding these expenses recognizes that wrongfully terminated employees may "incur[] expenses such as for transportation, room, and board, which they would not have incurred had they continued to work

---

**[2]**A weekly calculation is also consistent with wage and hour claims, where overtime *must* be calculated on a weekly basis. *See* 29 C.F.R. § 778.104.

for the respondent and not been forced, by virtue of the respondent's unfair labor practices, to leave their [jobs]." *Id.* at 498. One example would be an employee who used to walk to work but, after her wrongful firing, has to drive over an hour to earn the same wage. If the back pay award does not compensate her for the new commuting expenses, she is not reinstated to the status quo.

Lou's argues that the Board's calculation of interim expenses suffered from two infirmities. First, interim expenses should have been offset against interim earnings, rather than awarded as a separate category. This offset approach appears to have once been commonplace. *See, e.g.*, *N. Slope Mech.*, 286 N.L.R.B. 633, 638 n.19 (1987); *W. Tex. Utils. Co.*, 109 N.L.R.B. 936, 937 n.3 (1954); *Crossett Lumber*, 8 N.L.R.B. at 498. But three years ago, in *King Soopers, Inc.*, the Board recognized a problem with that method: It awarded "less than make-whole relief for the most seriously aggrieved victims of unlawful conduct, contrary to the central remedial principle underlying the Act." 364 N.L.R.B. No. 93, 2016 WL 4474606, at *7 (2016), *review granted in part*, *enforcement granted in part*, *King Soopers, Inc. v. NLRB*, 859 F.3d 23 (D.C. Cir. 2017). Because the offset method does not allow negative interim earnings, "[d]iscriminatees who find jobs that pay wages lower than the amount of their expenses will not receive full compensation for the search-for-work and interim employment expenses." *Id.*

The Board adopted a categorical shift to address this problem. It decided to "treat search-for-work and interim employment expenses in a manner consistent with our treatment of other losses suffered by the discriminatee"—that is, to "award[] compensation for these expenses regardless of discriminatees' interim earnings and separately from taxable net backpay, with interest." *Id.* at *8. On appeal, the D.C. Circuit approved this remedial shift, holding that "both the terms of the Act and the case law construing the Act support the Board's action." *King Soopers, Inc.*, 859 F.3d at 38. The costs that Hershey incurred while traveling to interim positions are properly categorized as an interim employment expense. *See D.L. Baker*, 351 N.L.R.B. at 537 (treating as an interim employment expense costs incurred while "traveling to and from out-of-town employment" above and beyond previous commuting costs). The Board therefore did not abuse its discretion by following the approach adopted in *King Soopers* in the present case.

Second, Lou's argues that the interim expenses were calculated from an improper baseline. Molenda assumed that, had Hershey continued to work at Lou's, he would have reported to the Lou's facility in Pontiac, Michigan. To calculate Hershey's interim travel expenses, Molenda subtracted the distance Hershey would have driven from his home to Pontiac from the distance Hershey had to drive to his interim employer; the result was then multiplied by the federal mileage reimbursement rate. Lou's stipulates that the roundtrip figures and mileage rates were correct, but argues that, had Hershey remained at Lou's, he would have worked out of a more distant facility in Flat Rock, not in Pontiac. Because Flat Rock was farther from Hershey's home than any of his interim jobs, the interim expenses should have been zero. The General Counsel responds that Hershey would not have continued to work out of Flat Rock and that, even if he had, he would have been required to report first to Pontiac.

The evidentiary record on both points is mixed. According to Hershey, Lou's managers told him that the Flat Rock job he was working on when he was fired in March would last only for the winter; "by April we'd be out." A Company manager testified that employees had been told the Flat Rock job was "going to run all winter," but explained that Lou's employees had still been working in Flat Rock as of August 2016, the end of the back pay period. Hershey disagreed; he said he drove past the Flat Rock site the month after he was fired and saw a different company's trucks doing the same work Lou's had been doing. With regard to reporting to Pontiac, Hershey testified that his dispatcher told him to meet at the Pontiac yard, park in a particular place, and bring his paperwork back to Pontiac from Flat Rock each evening. The manager said that there was no such requirement; Pontiac was just a convenient location for carpooling. Hershey said he was told he would be compensated for the drive, and the fact that he had not been was a point of contention. The manager said that Lou's had never intended to compensate employees for the commute, and the confusion about compensation resulted from a change in the customer's schedule.

Faced with contradictory testimony, the Board had to decide which party's explanations to credit. Once again, the deferential substantial evidence standard prevents us from substituting our judgment about the plausibility of the two scenarios for the Board's. *See S.E. Nichols*, 704 F.2d at 923. Because Hershey's testimony amounted to substantial evidence supporting the

NLRB's conclusion, the NLRB did not abuse its discretion by crediting that testimony, even if a different factfinder might have accepted the Company's evidence.

### D.     Retirement Benefits

The final category of Hershey's backpay award is lost retirement benefits from the 401(k) account he maintained while working at Lou's. To calculate this award, Molenda assumed that Hershey would have continued to put five percent of his earnings into his retirement account, as he had done prior to his termination. He then added the Company's 0.5% matching contribution and approximated the growth of the resulting investment. Lou's argues that both the individual-contribution amounts and the projected fund growth were erroneous.

Lou's does not, however, dispute that lost retirement benefits are properly charged to the employer as an independent subcategory of the back pay award. *See* 3 *NLRB Casehandling Manual*, *supra*, § 10544.3 ("Discriminatees should generally be made whole for lost contributions to pension funds or retirement plans . . . . Retirement benefits are not offset by interim wage earnings."). Benefits in individual retirement accounts, such as a 401(k), are included in this umbrella although there are uncertainties in the estimates. *See id.* (explaining that, for 401(k) accounts, "it is generally necessary to determine individual contribution amounts, employer matching contributions, investment selections, and finally to chart the earnings/loss of each discriminatee's 401(k) investments for the duration of the backpay period").

We begin with estimated contributions. The Company's payroll logs for Hershey consistently reflected a five-percent contribution to his 401(k) account throughout his period of employment. The Board could reasonably assume that he would have continued to contribute at that rate had he not been terminated. *See Webco Indus., Inc.*, 340 N.L.R.B. 10, 16–17 (2003) (deeming reasonable the assumption that the discharged employee would have continued to contribute at the same 12% rate he had previously used). Molenda then deducted those 401(k) contributions from the back pay award to avoid double counting. He also ceased counting contributions as of the date Hershey became eligible to participate in an interim employer's retirement plan. Lou's identifies no specific impropriety in this approach and offers no alternate method of calculating 401(k) contributions.

We next consider the model of the account's growth over the back pay period. Molenda testified that he contacted the manager of the fund Hershey had invested in and was told that the fund no longer exists and there was no way to provide information about its historical returns. He therefore had to select an alternate. Because the original fund was designed to reasonably approximate one stock index (the S&P 500), he projected investment growth based on a fund that published quarterly returns and had returns just below the same index. Lou's argues this selection was erroneous because the model fund was not one its employees could invest in. Molenda testified, however, that he did not have any information about the funds available to Lou's employees. Lou's does not explain how Molenda should have proceeded when it did not provide the fund information.

Because Lou's does not offer any feasible alternative methods by which retirement benefits could have been calculated, the Board did not abuse its discretion by adopting the General Counsel's approach.

**E.       Constitutional Claims**

Last of all, Lou's raises several constitutional claims, arguing the Board proceedings ran afoul of separation of powers, deprived it of due process, and denied it equal protection of the laws.

Lou's failed to present the due process and equal protection claims to the Board. The NLRA bars us from hearing any objection that "has not been urged before the Board, . . . unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see also Woelke & Romero Framing v. NLRB*, 456 U.S. 645, 665–66 (1982). Lou's presents no extraordinary circumstances argument excusing its failure, so we do not consider these two claims.

The remaining separation of powers claim is set out in a single page, with no citation to caselaw. It is forfeited for lack of proper development. *See Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 606 F.3d 301, 307 (6th Cir. 2010) ("[I]t is a settled appellate rule that a party forfeits issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (brackets omitted) (quoting *United States v. Johnson*, 440 F.3d 832,

845–46 (6th Cir. 2006))). Even if the argument is not forfeited, the Company's general dissatisfaction with agency adjudication can be swiftly resolved. The Supreme Court upheld the Board's structure decades ago. *See Amalgamated Util. Workers v. Consol. Edison Co.*, 309 U.S. 261, 265 (1940) ("Congress has entrusted to the Board exclusively the prosecution of the proceeding by its own complaint, the conduct of the hearing, the adjudication and the granting of appropriate relief."). And rather than insulating the Board from the other branches of Government, the NLRA explicitly provides for appointments by the President with advice and consent of the Senate, 29 U.S.C. § 153(a), and for review of Board decisions in Article III courts, *id.* § 160(e)–(f). Lou's makes no argument that these checks and balances undergirding the Board's structure were not adhered to, nor does it distinguish binding Supreme Court precedent. These arguments fail.

## III.   CONCLUSION

For the foregoing reasons, we **DENY** the petition for review and **GRANT** the General Counsel's cross-petition for enforcement.